521 So.2d 175 (1988)
Jerry DAY and Cory Day, Appellants,
v.
LE-JO ENTERPRISES, INC., Appellee.
No. 86-1960.
District Court of Appeal of Florida, Third District.
February 9, 1988.
Rehearing Denied March 28, 1988.
*176 Akerman, Senterfitt & Eidson and James M. Miller, Miami, for appellants.
Richard P. Zaretsky, W. Palm Beach, Philips, Curtin & DiGiacomo and John L. DiGiacomo, Paoli, Pa., for appellee.
Before HENDRY, HUBBART and FERGUSON, JJ.
HENDRY, Judge.
Jerry and Cory Day appeal from a judgment pursuant to a directed verdict entered against them on three out of four counts in the Days' counterclaim against Le-Jo Enterprises, and the trial court's denial of their motion to amend their counterclaim pursuant to section 817.416, Florida Statutes (1981). Appellants argue sufficient evidence was adduced at trial which would support a possible verdict in their favor. We agree. It was error to take the counterclaim from the jury.
The Days first came into contact with Le-Jo Enterprises when Jerry Day responded to a newspaper advertisement soliciting distributors who "can handle a six figure business." At that time, Jerry was an auto mechanic with limited sales experience and his wife was a bookkeeper. Following interviews by Le-Jo representatives, the Days were notified on October 16, 1980, that they had been selected as the South Florida distributor. One of those who interviewed the Days later testified that the couple had been the only applicants willing to leave a $1,000 deposit on the distributorship.
After traveling to the manufacturer's Pennsylvania headquarters for training and "negotiations," Jerry and Cory Day signed an exclusive distributorship agreement with Le-Jo Enterprises for a term of fifteen years for the amount of seventeen thousand dollars. In exchange, the Days were given the territory of Dade, Broward and Monroe Counties in which to market table illumination products sold by Le-Jo under the trade name, "Dine-Aglow." A patented, disposable fuel cartridge and a complementary line of decorative lamps and accessories compose the product line.
Among the representations made to the Days during their training period was a projected annual income of $500,000 from 500 fuel sale accounts. Le-Jo's vice president for marketing admitted at trial that the statement was unsupported by any of their distributors' experience, and a former company executive testified that the $500,000 figure was "greatly exaggerated." Significant also is the testimony that, soon after the Days began operation, the company discussed plans to terminate their contract as soon as possible and "no matter what."
By the distributorship agreement, the Days were required to purchase all fuel cartridges, Dine-Aglow lamps and accessories exclusively from Le-Jo; sales were to be made solely within the assigned geographical territory unless written permission was first obtained from Le-Jo; a minimum quota of fuel cartridge purchases was established for every six month period; the use of the name "Dine-Aglow" was prohibited except in the context of a sale; and Le-Jo was given a right of first refusal should the Days wish to sell their distributorship. They did not receive a list of other distributors nor disclosure of Le-Jo's financial condition. The Days opened their business under the name of "Dine-Aglow of South Florida" and it was under this name that Le-Jo printed their brochures.
Although the agreement provided in part that the Days were not to sell Dine-Aglow products outside their assigned territory, on at least three occasions Le-Jo's marketing officer gave them a number of sales leads outside their designated area. Then, in March 1982, Le-Jo threatened to unilaterally terminate the Days' 15-year distributorship because they had sold Dine-Aglow products to a customer on the west coast of Florida. When the Days offered to make retribution, as allowed under the agreement, Le-Jo rejected the proposed remedy, announced orders from the Days would no longer be honored, and likened the west coast sales to such irremediable acts as adultery and murder. The notice of termination was withdrawn in May of 1982 in exchange for the execution of a rider by which the Days' territory was cut in half, *177 Cory Day was forced to quit her bookkeeping job and the six month fuel sales quota was increased.
In August of the following year, Le-Jo again terminated the Days' distributorship and filed suit against them for damages and injunctive relief for breach of the distributorship agreement. A counterclaim sought, inter alia, damages for an illegal tying under section 542.18, Florida Statutes (1981); unfair and deceptive trade practices under section 501.201, Florida Statutes (1981); and fraudulent misrepresentations. Le-Jo tried its claims non-jury after which the counterclaim was tried before a jury. At the close of the Days' case, the court granted Le-Jo's motion for directed verdict as to the illegal tying, unfair and deceptive practices and fraud, while allowing the breach of contract count to go to the jury. A verdict in favor of Le-Jo was returned, final judgment was entered and this appeal from the judgment pursuant to the directed verdict followed.
"Only where the record is devoid of any evidence from which a jury of reasonable men could find liability, may a judgment based on a directed verdict stand." Allen v. Florida Power Corp., 253 So.2d 401, 403 (Fla. 1971). "It is axiomatic that directed verdicts should not be entered if the evidence is conflicting and permits different, reasonable inferences." City of Hialeah v. Rehm, 455 So.2d 458, 460 (Fla. 3d DCA), review denied, 462 So.2d 1107 (Fla. 1984). "[E]ven if a preponderance of the evidence favors the movant, a directed verdict is an encroachment on the province of the jury." Medina v. 187th Street Apts., Ltd., 405 So.2d 485, 486 (Fla. 3d DCA 1981). "The ultimate question then is whether there was any evidence upon which a jury could have lawfully found a verdict for the defendants." Martin v. Thompson, 124 So.2d 744 (Fla. 3d DCA 1960).
The Days claim the distributorship agreement contained an illegal tying arrangement. For there to be an unlawful tie, there must be two separate products: a tying product which the buyer cannot obtain without the purchase of a tied product, Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), or at least agrees that he will not purchase from any other supplier. Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). In addition to the tied products, a federal court has cited four other elements to be found in illegal tying arrangements: evidence of actual coercion by the seller that in fact forced the buyer to [purchase] the tied product; a seller's sufficient market power in the tying product market to force the buyer to accept the tied product; anti-competitive effects in the tied market; and involvement of a not insubstantial amount of interstate commerce in the tied product market." Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486, 1502-03 (11th Cir.1985).
Although Le-Jo argues that only one integrated product is involved, the agreement, the distributor's manual and the company's marketing procedures treat the fuel cartridges and the lamps separately. It is the agreement which ties the two items: "The Distributor will sell, lease or loan Dine-Aglow lamps and fuel exclusively and will not stock, sell, offer to sell, lease or loan any similar or competing product during the life of this agreement." "Where the express language of a contract embodies the tie, a prima facie case of tying is established." Photovest Corp. v. Fotomat Corp., 606 F.2d 704 (7th Cir.1979), cert. denied, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980).
The not insubstantial requirement of an illegal tying (Amey, 758 F.2d at 1503) relates to whether a total amount of business, substantial enough so as not to be de minimis, is foreclosed to competitors by the tie. Ungar v. Dunkin' Donuts of Am., Inc., 68 F.R.D. 65 (E.D.Pa. 1975). Where the tying product is patented  such as Le-Jo's fuel cartridge  sufficient economic power is presumed. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) (patent for a salt product machine conferred no right "to restrain the use of, or trade in, unpatented salt") 332 U.S. at 396, 68 S.Ct. at 15. Accordingly, because there is sufficient evidence *178 in the record from which the finders of fact could have found the arrangement between the Days and Le-Jo fell within the bounds of an illegal tying, we reverse the judgment pursuant to the directed verdict on that count. Since the Days' antitrust claim is brought under the Florida Antitrust Act of 1980, the federal requirement (Sherman Antitrust Act, 15 U.S.C.A. § 1 et seq.) that interstate commerce be involved need not be met. See St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc., 457 So.2d 1028 (Fla. 2d DCA 1984).
The evidence, when viewed in a light most favorable to the Days, would also sustain a factual finding that Le-Jo made promises to the Days which it never intended to perform or which it knew were illusory. Specifically, the testimony of Le-Jo executives would support inferences that Le-Jo never intended to honor the contract's fifteen-year term, and that by false representations of sales history, they induced the Days to part with their money, their efforts and their jobs in order to establish a market intended from the start to be retrieved, "no matter what." Where there is substantial evidence tending to prove the defendant's issue, a verdict should not be directed for the plaintiff. Glass v. Virginia-Carolina Chemical Co., 73 Fla. 873, 74 So. 981 (1917).
In considering whether evidence of Le-Jo's actions would support a finding of unfair and deceptive practices, we note that the court in Urling v. Helms Exterminators, Inc., 468 So.2d 451 (Fla. 1st DCA 1985), found the concept of "unfair and deceptive" to be extremely broad. It cited to the federal case of Spiegel, Inc. v. Federal Trade Comm'n, 540 F.2d 287, 293 (7th Cir.1976), for the proposition that "a practice is unfair" under the Federal Trade Commission Act, 15 U.S.C.A. § 45(a)(1), when it "offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," (or competitors or other businessmen). 540 F.2d at 293 n. 8. The record reflects sufficient evidence to support a verdict that Le-Jo had engaged in "unfair and deceptive trade practices." That evidence would support an inference that Le-Jo deliberately misled the Days into making extra-territorial sales when it suited Le-Jo's interests, and then used such sales as a pretext for terminating the Days' contract.
In light of the evidence and these reasonable inferences, we hold the taking of the Days' counterclaim from the jury was error. While we find no error in the trial court's denial of the motion to amend the counterclaim on the eve of trial, in view of Florida's policy to freely grant such requests and in the interests of justice, Rule 1.190(a), Fla.R.Civ.P., on remand the trial court should permit the defendants to amend their counterclaim. See Orange Motors of Coral Gables, Inc. v. Rueben H. Donnelley Corp., 415 So.2d 892 (Fla. 3d DCA 1982).
Accordingly, the judgment appealed is reversed and the cause remanded for further proceedings.
Reversed and remanded.