**NATURE'S PRODUCTS, INC., Plaintiff,**

v.

**NATROL, INC. and FCC Products, Inc., Defendants.**

**Natrol, Inc., Counter–Plaintiff,**

v.

**Nature's Products, Inc., Counter–Defendant,**

**FCC Products, Inc., Third–Party Plaintiff,**

v.

**Commercial Proteins Corporation, Third–Party Defendant.**

Case No. 11–62409–CIV.

United States District Court, S.D. Florida.

Oct. 7, 2013.

Jorden Burt, P.A., Miami, FL, for Plaintiff.

Mesrop G. Khoudagoulian, Law Offices of Mesrop Khoudagoulian, Glendale, CA, Barton Stuart Sacher, Joseph Alan Sacher, Roy Mark Hartman, Michael F. Reese, Sacher, Zelman, Hartman, Paul, Beiley & Sacher, P.A., Miami, FL, for Defendant.

## AMENDED [1] OMNIBUS ORDER DENYING AND GRANTING, IN PART, CROSS MOTIONS FOR SUMMARY JUDGMENT

WILLIAM P. DIMITROULEAS, District Judge.

THIS CAUSE is before the Court upon Natrol, Inc.'s Motion for Final Summary Judgment ("Natrol's Motion for Summary Judgment") [DE 202], filed herein on July 3, 2013, and Plaintiff, Nature's Products, Inc.'s Motion for Summary Judgment on Its Complaint and Against Defendant, Natrol, Inc. on Its Affirmative Defenses to Complaint and Counterclaim ("NPI's Motion for Summary Judgment") [DE 212], filed herein on July 8, 2013. The Court has carefully considered the Motions [DE 202, 212], the Responses [DE 234, 238], the Replies [DE 252, 254], and the evidence submitted in the record. The Court is otherwise fully advised in the premises.

### I. BACKGROUND

The parties have provided in their respective Statements of Material Facts [DE 203; DE 212 at 3–11] various factual assertions that are supported by the record. In some instances, the parties have not contested their adversaries' assertions. In other instances, the parties have contested their adversaries' assertions but without citing sufficient materials in the record to refute those assertions. The Court will

Alan Rosenthal, Natalie Jessica Carlos, Charles W. Throckmorton, Carlton Fields

---

1. This Order amends the Court's September 25, 2013, Omnibus Order [DE 312] to correct two scrivener's errors, as identified in Natrol's October 3, 2013, Notice [DE 325].

deem all of these uncontested—or insufficiently contested—factual assertions to be admitted. *See* S.D. Fla. L.R. 56.1(b); Fed. R.Civ.P. 56(c), (e). The Court will now set forth the relevant admitted facts.

The parties to this action are Plaintiff Nature's Products, Inc. ("NPI") and Defendants Natrol, Inc. ("Natrol") and FCC Products, Inc. ("FCC").[2] NPI and Natrol are both global manufacturers and distributors/suppliers of healthcare products. [DE 212 ¶ 1; DE 229 ¶ 1].

Natrol and NPI had business dealings from the late 1990's through 2011. [DE 212 ¶ 2; DE 239 ¶ 2]. In 2001, Natrol and NPI executed an open-ended indemnity agreement (the ("Indemnity Agreement" or "Agreement"), which "appl[ied] to any and all products (whether packaged for resale or in bulk) that Natrol may purchase from [NPI]." [DE 203 ¶ 3; DE 234 at 3–6; DE 47–1] ).

In 2009, NPI contracted with Natrol and assumed manufacturing responsibilities for certain of Natrol's ProLab brand products (the "ProLab Products" or "Products"). [DE 203 ¶ 5; DE 234 at 3–6; 212 ¶¶ 5, 9; DE 239 ¶¶ 5, 9].[3] Century Foods, International ("Century Foods") had been Natrol's previous manufacturer. [DE 203 ¶ 6; DE 234 at 3–6]. NPI manufactured the ProLab's products from approximately July 2009 to August 2011. [DE 212 ¶ 14; DE 239 ¶ 14]. Natrol provided NPI with the labels to be affixed to the ProLab Products. [DE 212 ¶¶ 15–16; DE 239 ¶¶ 15–16]. Those labels represented that the ProLab Products were wheat and gluten free. [DE 212 ¶¶ 15–16; DE 239 ¶¶ 15–16].

In March 2010, NPI returned to Natrol Finished Product Allergen Questionnaires (the "Questionnaires")—as completed by NPI's Regulatory and Compliance Manager—which represented that the ProLab Products created by NPI were free of wheat and gluten allergens. [DE 203 ¶ 20; DE 234 at 3–6]. In June 2010, NPI began providing the completed ProLab Products to Natrol. [DE 203 ¶ 21; DE 234 at 3–6].

In September 2011, after an investigation by the United States Food and Drug Administration (the "USFDA"), NPI determined that the ProLab Products did contain wheat and gluten. [DE 203 ¶ 29; DE 234 at 3–6; DE 212 ¶¶ 17–18; DE 239 ¶¶ 17–18]. One ingredient of the ProLab Products was glutamine peptide, which contained the wheat and gluten. [DE 203 ¶¶ 15, 23, 29; DE 234 at 3–6; DE 212 ¶¶ 17–18; DE 239 ¶¶ 17–18]. NPI then informed Natrol of this discovery. [DE 203 ¶ 31; DE 234 at 3–6]. The ProLab products previously manufactured by Century Foods—Natrol's preceding manufacturer—had also contained wheat and gluten. [DE 212 ¶ 18; DE 239 ¶ 18].

In mid-September 2011, Natrol initiated a recall of the ProLab Products. [DE 203 ¶ 39; DE 234 at 5–6]. NPI and Natrol discussed the possibility of relabeling the recalled products. [DE 212 ¶¶ 19–20; DE 239 ¶¶ 19–20]. However, Natrol subsequently cancelled all existing purchase orders with NPI and destroyed the recalled ProLab Products. [DE 212 ¶ 20; DE 239 ¶ 20].

NPI initiated this action on November 10, 2011, bringing claims against Natrol for breach of contract and unjust enrichment for Natrol's failure to pay NPI's

---

2. All claims against FCC were dismissed on September 23, 2013. *See* [DE 308].

3. In its Response [DE 234], NPI contested only eight (8) of Natrol's forty-four (44) statements of material facts. *See* [DE 203 ¶¶ 1–44;

DE 234 at 3–6]. The Court, where applicable, has deemed some of these uncontested facts to be admitted. *See* S.D. Fla. L.R. 56.1(b); Fed.R.Civ.P. 56(c), (e).

invoices. *See* [DE 1]. Natrol brought counterclaims against NPI for breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, breach of the Florida Deceptive and Unfair Trade Practices Act, and civil remedies for violations of Lanham Act. *See* [DE 47]. NPI now seeks summary judgment on its breach of contract claim arising from for $1,025,398.73 in unpaid invoices issued to Natrol, as well as summary judgment in its favor on each of Natrol's counterclaims. [DE 212]. Natrol, in turn, seeks summary judgment on each of its counterclaims, with an award of $5,636,196.00 in damages, including prejudgment interest.[4] *See* [DE 202].

## II. STANDARD OF REVIEW

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant bears "the stringent burden of establishing the absence of a genuine issue of material fact." *Sauve v. Lamberti*, 597 F.Supp.2d 1312, 1315 (S.D.Fla.2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

"A fact is material for the purposes of summary judgment only if it might affect the outcome of the suit under the governing law." *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir.2005) (internal quotations omitted). Furthermore, "[a]n issue [of material fact] is not 'genuine' if it is unsupported by the evidence or is created by evidence that is 'merely colorable' or 'not significantly probative.'" *Flamingo S. Beach I Condo. Ass'n, Inc. v. Selective*

*Ins. Co. of Southeast*, 492 Fed.Appx. 16, 26 (11th Cir.2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be evidence from which a jury could reasonably find for the non-moving party." *Id.* at 26–27 (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). Accordingly, if the moving party shows "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party" then "it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Rich v. Sec'y, Fla. Dept. of Corr.*, 716 F.3d 525, 530 (11th Cir.2013) (citation omitted).

## III. DISCUSSION

### A. NPI's Motion for Summary Judgment

#### 1. NPI's Claim Against Natrol for Breach of Contract

NPI seeks summary judgment on its breach of contract claim against Natrol. That claim arises from open invoices for various products—including the ProLab Products—that NPI delivered to Natrol.

 Because federal courts sitting in diversity generally apply state law to questions of contract, the Court applies Florida law to the instant breach of contract claim. *See Centennial Bank v. Falke*, No. 5:12cv114/RS/EMT, 2013 WL 950943, at *3 (N.D.Fla. Feb. 8, 2013) (citing *In re Chira*, 567 F.3d 1307, 1311 (11th Cir.2009)). "Under Florida law, the elements of a breach

---

4. If set-off by NPI's full claim for unpaid invoices plus prejudgment interest, Natrol's damages would be $4,524,029.00. [DE 203 ¶ 44; DE 234 at 3–6]

of contract action are (1) a valid contract, (2) a material breach, and (3) damages." *Id.* (citing *Beck v. Lazard Freres & Co., LLC,* 175 F.3d 913, 914 (11th Cir.1999)).

Although contract interpretation is generally a question of law for the Court, "[i]f the contract contains ambiguities [ ] a question of fact for the jury may be presented." *PartyLite Gifts, Inc. v. MacMillan,* 895 F.Supp.2d 1213, 1232 (M.D.Fla.2012) (citing *Quayside Assocs., Ltd. v. Harbour Club Villas Condo. Ass'n, Inc.,* 419 So.2d 678, 679 (Fla. 3d DCA 1982)). " 'Where the wording of an agreement is ambiguous, its interpretation involves [a] question of fact, precluding summary disposition.' " *PartyLite Gifts, Inc.,* 895 F.Supp.2d at 1235 (quoting *Smith v. Shelton,* 970 So.2d 450, 451 (Fla. 4th DCA 2007)); *see also Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen and Firemen Ret. Sys. of Detroit,* 50 F.3d 908, 919 (11th Cir.1995) ("Generally, the proper construction of an ambiguous contract term is a question of fact which should be reserved to the jury." (citing *Fecteau v. Se. Bank, N.A.,* 585 So.2d 1005, 1007 (Fla. 4th DCA 1991))). Moreover, "[u]nder Florida law, extrinsic evidence is admissible regarding the intent of parties to a contract if a latent ambiguity exists." *PartyLite Gifts, Inc.,* 895 F.Supp.2d at 1233 (citing *United States on Behalf of Small Bus. Admin. v. S. Atl. Prod. Credit Ass'n,* 606 So.2d 691, 695 (Fla. 1st DCA 1992)). "A latent ambiguity . . . is said to exist where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is necessary for interpretation or a choice between two possible meanings. In such instance, this evidence is required because the instrument itself does not provide sufficient insight into the intent of the parties." *Johnson Enters. of Jacksonville,*

*Inc. v. FPL Grp., Inc.,* 162 F.3d 1290, 1310 (11th Cir.1998).

In light of these principles, the Court finds that genuine disputes of material fact remain as to NPI's claim for breach of contract. The undisputed facts on the record do show that there was *some* contractual relationship between NPI and Natrol. Indeed, each party has asserted claims for breach of contract with respect to the ProLab Products. *See* [DE 1 ¶¶ 28–36; DE 47 ¶¶ 27–34; DE 212 ¶ 9; DE 239 ¶ 9; DE 203 ¶ 5; DE 234 at 3–6]. However, factual questions remain as to the terms of the parties' contractual relationship and whether those terms were breached.

These questions exist largely because NPI and Natrol do not have a thorough written contract memorializing their arrangement for the manufacture of the ProLab Products. NPI asserts that "[t]here is no manufacturing contract or agreement between NPI and Natrol for the Prolab® products, as Natrol had with Century Foods and subsequent manufacturers" and that "other than the approved specifications and purchase orders, NPI has no contract with Natrol to manufacture Prolab products." [DE 212 ¶ 23 n. 10; DE 234 at 9]. NPI, therefore, relies on "open invoices" to reflect the contract. [DE 212 ¶¶ 8–10, 14, 25]. NPI argues that "Natrol does not dispute that it owes NPI $1,025,398.73 in open invoices, $747,433.93 of which is owed for products not affected by the USFDA recall" and that "the invoices are valid contracts for payment, which Natrol materially breached by failing to pay NPI after accepting, selling and/or destroying the finished products."[5] [DE 212 at 11; DE 254 at 2].

**5.** In support of its argument for summary judgment on its breach of contract claim, NPI

relies on a single case, in which the court dismissed a breach of contract claim as time-

In response, Natrol argues that NPI fails to provide evidence supporting each element for a breach of contract claim and, therefore, fails to satisfy the standard for summary judgment. Nevertheless, Natrol asserts its own claim for "NPI's breach of manufacturing agreements" and maintains that "NPI contracted with, and began manufacturing ProLab products for Natrol." *See* [DE 203 ¶ 5; 202 at 8–10; DE 47 ¶¶ 27–34].

Thus, the record reveals that NPI and Natrol agree that they entered into a contract involving the manufacture of the Pro-Lab Products but dispute the terms of their respective rights and duties under that contract. If—as asserted by NPI— the unpaid invoices are the contract, then that contract does not specify the parties' rights or duties in certain situations, such as the instant situation where the ProLab Products have been manufactured, delivered, and redistributed before the revelation that those Products contain wheat/gluten. Consequently, that contract includes latent ambiguity. *See, e.g., LSQ Funding Grp., L.C. v. EDS Field Servs.,* 879 F.Supp.2d 1320, 1332 (M.D.Fla.2012) ("A latent ambiguity arises when a contract appears clear and unambiguous on its face but fails to specify the rights or duties of the parties in certain situations. . . . A latent ambiguity creates a question of material fact regarding the correct interpretation of the agreement." (internal citations omitted)). Thus, material questions remain as to the parties' rights and duties, and the jury must resolve those questions.[6]

### 2. Natrol's Counterclaims Against NPI

NPI argues that Natrol cannot recover on any cause of action because Natrol could have prevented its own losses [7] and because Natrol's damages are too speculative. Relying on these assertions, NPI submits that it is entitled to summary judgment on each of Natrol's counterclaims.[8]

The Court disagrees. NPI has failed to identify and address the elements of Natrol's six distinct counterclaims. Rather, NPI has conflated those claims, arguing

barred under Florida law. *See* [DE 254 at 2] (citing *Lion Life, LLC v. Regions Bank,* 2013 WL 2367823, at *1–2 (S.D.Fla. May 29, 2013)). NPI does not cite any authority supporting the proposition that an invoice constitutes a valid contract.

6. The Court notes that the existence of a contract is a question of fact that can preclude summary judgment. *See Lockheed Martin Corp. v. Galaxis USA, Ltd.,* 222 F.Supp.2d 1315, 1323–24 (M.D.Fla.2002) ("[T]he existence of a contract is a question of fact to be determined by consideration of all the facts and circumstances."); *Ioselev v. Schilling,* No. 3:10–cv–1091–J–34MCR, 2013 WL 271711, at *2 (M.D.Fla. Jan. 24, 2013) ("[Q]uestions of material fact as to the existence of a contract . . . preclude the entry of summary judgment."). Nevertheless, although NPI and Natrol disagree as to material characteristics of their contract for the manufacture of the ProLab Products, neither

party appears to contest the formation of that contract.

7. In support, NPI relies on three factual assertions. First, NPI asserts that Natrol required the inclusion of glutamine peptide to the ProLab Products. Second, NPI asserts that Natrol instructed NPI to affix the labels that inaccurately represented the Products as wheat and gluten free. Third, NPI asserts that Natrol elected to destroy rather than relabel and re-distribute the ProLab Products.

8. Those counterclaims include the following: Count 1 for Breach of Contract; Count II for Breach of Express Warranty; Count III for Breach of Implied Warranty of Merchantability; Count IV for Breach of Implied Warranty of Fitness for a Particular Purpose; Count V for Breach of Florida Deceptive and Unfair Trade Practices Act; and Count VI for Civil Remedies for Violations of Lanham Act. [DE 47 ¶¶ 27–69].

only that recovery is precluded under Florida Statutes § 672.715 (defining consequential damages), the Eleventh Circuit's holding in *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 878–79 (11th Cir.2005) (considering the availability of lost profits), and the "unclean hands" doctrine. Those authorities and doctrines are insufficient to establish that there are no genuine disputes of material fact and that NPI is entitled to judgment as a matter of law. Indeed, each of those principles is either inapplicable or relates to the factual issue of calculating damages.

■ First, "[q]uestions regarding the reasonableness and quantification of damages are generally issues of fact." *See Exim Brickell LLC v. PDVSA Servs. Inc.*, 516 Fed.Appx. 742, 759 (11th Cir.2013) (citing Fla. Stat. § 672.715). Therefore, the jury—rather than the Court on summary judgment—should weigh the evidence and resolve at trial all factual questions relating to consequential damages. For the same reason, NPI's reliance on *HGI Associates, Inc.* is inapposite. In that case the Eleventh Circuit articulated the standard for recovery of lost profits, stating that a court should limit "lost profits recovery unless [the buyer] could not reasonably have prevented the loss by cover or otherwise." *Id.* at 881. However, lost profits are nothing but a type of consequential damages. *See Hardwick Properties, Inc. v. Newbern*, 711 So.2d 35, 40 (Fla. 1st DCA 1998) ("The most common form of consequential damages is lost profits." (citing *Nyquist v. Randall*, 819 F.2d 1014, 1017 (11th Cir.1987))). Because material factual questions remain, NPI is not entitled to

summary judgment on Natrol's affirmative claims.

■ Second, summary judgment would be inappropriate even if NPI could establish that, as a matter of law, Natrol is not entitled to consequential damages.[9] Even if Natrol is not entitled to consequential damages, other types of damages may be available. In breach of contract claims, for example, there is a distinction between general damages and consequential damages. *See Hardwick Properties, Inc.*, 711 So.2d at 39–40 ("[G]eneral damages may be described as those damages as may fairly and reasonably be considered as arising in the usual course of events from the breach of contract itself" whereas "consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the nonbreaching party in its dealings, often with third parties, which were a proximate result of the breach ...." (internal citations and quotations omitted)). Furthermore, Natrol's FDUTPA claim, which revolves around actual damages, would stand regardless of whether Natrol is foreclosed from consequential damages. *See, e.g., Rodriguez v. Recovery Performance & Marine, LLC,* 38 So.3d 178, 180 (Fla. 3d DCA 2010) ("[U]nder FDUTPA, the term "actual damages" does not include special or consequential damages"). Similarly, there is no reason why Florida law would apply to Natrol's claim under the Lanham Act, which provides a Court wide discretion in allowing damages up to three times the amount of actual damages. *See Slep–Tone Entm't Corp. v. Johnson,* 518 Fed.Appx. 815, 819 (11th Cir. 2013) (citing 15 U.S.C. § 1117(a)). Thus,

---

**9.** Florida Statutes § 672.715 defines "consequential damages" under Florida law, providing, in relevant part, as follows:

(2) *Consequential damages resulting from the seller's breach include:*

(a) Any loss resulting from general or particular requirements and needs of which

the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) Injury to person or property proximately resulting from any breach of warranty.

NPI's argument about consequential damages cannot, as a matter of law, foreclose liability under all of Natrol's causes of action.[10]

■■■■ Finally, NPI's reliance on the "unclean hands" doctrine is misplaced. "The unclean hands doctrine 'closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'" *Royal Palm Props., LLC v. Premier Estate Props., Inc.,* No. 10–80232–CV, 2010 WL 3941745, at *2 (S.D.Fla. Oct. 6, 2010) (quoting *ABF Freight Sys., Inc. v. N.L.R.B.,* 510 U.S. 317, 329–30, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994)). However, "the unclean hands doctrine traditionally only applies to equitable remedies and does not bar a plaintiff from recovering damages." *Id.* (citing *Mitchell Bros. Film Grp. v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir.1979)); *See also Regions Bank v. Old Jupiter, LLC,* No. 10–80188–CIV, 2010 WL 5148467, at *6 (S.D.Fla. Dec. 13, 2010). Accordingly, NPI's "unclean hands" defense cannot defeat Natrol's six causes of action.

Thus, NPI has not met its burden to obtain summary judgment on Natrol's affirmative claims.[11] The Court will next consider whether Natrol is entitled to summary judgment.

### B. *Natrol's Motion for Summary Judgment*

#### 1. *Breach of Manufacturing Agreements*

Natrol argues that NPI breached agreements for the manufacture of the ProLab Products. Natrol asserts that NPI manufactured "non-conforming, defective, adulterated, mislabeled, and misbranded Finished. Products, which were re-sold by Natrol," which led to the eventual recall of those Products. [DE 202 at 9]. In support, Natrol relies on the Questionnaires, through which NPI incorrectly certified that the ProLab Products would be wheat and gluten free.

The Court finds that there are genuine disputes of material fact as to breach of the manufacturing contracts between Natrol and NPI. As stated, *supra,* NPI and Natrol agree that they entered into a contract but dispute the terms of their respective rights and duties under that contract. Indeed, although the parties focus on the same arrangement for the manufacture of the ProLab Products, NPI identifies the invoices as the operative document(s) whereas Natrol focuses on the Questionnaires and Products' labels. Consequently, factual questions remain as to the terms of the parties' manufacturing agreement(s), and the jury must resolve those questions.

#### 2. *Breach of the Indemnity Agreement*

It is undisputed that the NPI and Natrol entered into the Indemnity Agreement on November 5, 2001. *See* [DE 47–1; DE 203 ¶ 3; DE 234]. The Indemnity Agreement provides, in relevant part, as follows: [12]

This Agreement shall apply to any and all products (whether packaged for resale or in bulk) that Natrol may purchase from Supplier ("Products").

---

10. In any case, there are genuine factual disputes as to whether Natrol is entitled to its claimed consequential damages.

11. Nevertheless, as discussed below, NPI—through its opposition to Natrol's affirmative motion-has established that it is entitled to summary judgment on Natrol's Lanham Act claim.

12. "Supplier" is defined in the Indemnity Agreement as "Natures Products Inc."

\* \* \*

Supplier specifically warrants that at the time Natrol takes title to the Products, the Products shall not be adulterated, misbranded, or otherwise in violation of the Federal Food, Drug and Cosmetic Act or any state or local laws governing the manufacturing, marketing, advertising and sale of such products.

\* \* \*

Supplier hereby agrees to defend, indemnify and hold Natrol, its affiliates and subsidiaries, distributors, retailers, dealer and the officers, directors, and employees of each of them harmless from and against any and all damages, losses, expenses, costs, claims, judgments and liabilities, including without limitation attorneys' fees and regulatory penalties, incurred by Natrol arising from or in connection, or in any manner related to … the breach of any representation or warranty expressed or implied of Supplier pertaining to the Products.

\* \* \*

The provisions of this Indemnity Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of Supplier and Natrol and shall supersede all prior agreements and understandings relating to the subject matter hereof and embodies the entire agreement and understanding with respect to this subject matter.

[DE 47–1 ¶¶ 1–3].

Natrol argues that NPI has violated the Indemnity Agreement. Natrol submits that NPI, through the Questionnaires, inaccurately represented that the ProLab Products would not contain wheat or gluten. Natrol further submits that the inac-

curate representation has caused Natrol damages for which NPI must provide indemnity.

NPI asserts two arguments in response. First, NPI argues that the Indemnity Agreement does not apply to the instant relationship involving NPI's manufacture of products on Natrol's behalf. Rather, the Indemnity Agreement was limited to a previous relationship through which NPI supplied its own products to Natrol for resale. In support, NPI relies on testimony from Jose Minski, its President and CEO, that the manufacture of products by a seller on a customer's behalf differs from the supply of the seller's own products to that customer for re-sale. *See* [DE 234 at 13–14]. NPI also relies on a 2009 non-use and non-disclosure agreement and a 2010 indemnity agreement, both of which address a new manufacturing relationship that differs from the parties' previous supplier/reseller relationship. *See* [DE 234 at 13–14; DE 234–1; DE 234–2].

Second, NPI argues that it is not liable even if the Indemnity Agreement applies to the ProLab Products. NPI relies on a doctrine that an indemnification contract—unless clearly and expressly stating otherwise—will not indemnify a party for losses resulting from that party's own negligence.

The Court disagrees with NPI. The Indemnity Agreement applies to the ProLab Products and requires NPI to indemnify Natrol for damages arising from the false representations in the Questionnaires.

 The issue is one of contract interpretation. Under Florida law,[13] "[c]ontract interpretation normally raises questions of law for the court to resolve." *Nat'l R.R. Passenger Corp. v. Rountree Transp. and Rigging, Inc.*, 286 F.3d 1233,

---

13. Neither party contests that Florida law applies to the Indemnity Agreement. In addressing the Indemnity Agreement, each party cites to Florida cases. *See* [DE 234 at 14–15; DE 252 at 7–8].

1262 (11th Cir.2002) (citing *DEC Elec., Inc. v. Raphael Constr. Corp.*, 558 So.2d 427, 428 (Fla.1990)). "[I]f a contract provision is clear and unambiguous, a court may not consider extrinsic or parol evidence to change the plain meaning set forth in the contract. A word or phrase is ambiguous only when it is of uncertain meaning, and may be fairly understood in more ways than one." *Cost Recovery Servs. LLC v. Alltel Commc'ns, Inc.*, 259 Fed.Appx. 223, 225–26 (11th Cir.2007) (internal citations and quotations omitted). Moreover, "[i]n interpreting an indemnity agreement, courts are to look to 'the logical meaning and intent of the contract.'" *Nat'l R.R. Passenger Corp.*, 286 F.3d at 1262 (quoting *Misener Marine Constr. Co. v. Southport Marine, Inc.*, 377 So.2d 757, 758 (Fla. 2d DCA 1979)). "Words should be given their natural meaning or the meaning most commonly understood in relation to the subject matter and circumstances, and reasonable construction is preferred to one that is unreasonable." *Golf Scoring Sys. Unlimited, Inc. v. Remedio*, 877 So.2d 827, 829 (Fla. 4th DCA 2004).

■ These principles reveal that the Indemnity Agreement covers the ProLab Products. The Indemnity Agreement is clear and unambiguous with respect to its scope: it applies to "any and all products (whether packaged for resale or in bulk) that Natrol may purchase from [NPI]." [DE 47–1 ¶ 1]. This broad provision does not limit the covered products by type, purpose, or time. Rather, it encompasses all products—including the ProLab Products—that Natrol purchased from NPI. Because the terms are unambiguous, the Court cannot limit those terms by considering the parol evidence submitted by NPI. Furthermore, NPI's interpretation— that the Indemnity Agreement "applied only to the sale of NPI's own products, e.g. softgel capsules, but does not apply to

products manufactured for customers"— would require an insertion of words into the Agreement (e.g. "any and all *of NPI's own* products *and not products manufactured for Natrol*"). Such an interpretation is impermissible. *See Ferreira v. Home Depot/Sedgwick CMS*, 12 So.3d 866, 868 (Fla. 1st DCA 2009) ("[I]t is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties."); *John M. Floyd & Assocs., Inc. v. First Fla. Credit Union*, 443 Fed.Appx. 396, 399 (11th Cir.2011) (rejecting a party's interpretation that "would require inserting words" into a contractual provision).

■ Having found that the Indemnity Agreement applies to the ProLab Products, the Court now considers NPI's responsibility or liability for those Products. The Indemnity Agreement requires NPI to indemnify Natrol "from and against any and all damages, losses, expenses, costs, claims, judgments and liabilities ... in any manner related to ... the breach of any representation ... of NPI ... pertaining to the [covered] Products." [*Id.*]. This language is broad and unambiguous. It applies to the instant situation where NPI incorrectly represented to Natrol that the ProLab Products were wheat and gluten free, Natrol sold those Products with a label containing that representation, and Natrol subsequently recalled those Products because of the inaccurate representation.

Moreover, NPI is liable under the Indemnity Agreement even though NPI made its inaccurate representation after Natrol had ordered the ProLab Products and after NPI had begun manufacturing those Products. If NPI had properly completed the Questionnaires—indicating that the ProLab Products as ordered by Natrol would include wheat/gluten—then Natrol would have had options as to how to proceed and limit its losses. Natrol could

have asked NPI to stop production and/or could have ordered new products with amended specifications.[14] Before distributing the Products for sale by retailers, Natrol could have made an informed decision as to how to maximize profits and limit damages for the Products. Accordingly, NPI's inaccurate representation deprived Natrol of its options for remedying a situation where it had ordered Products that contained wheat and gluten. Natrol's losses, expenses, costs, or damages are in some manner related to the breach of a representation made by NPI.[15] Consequently, NPI is liable to Natrol under the Indemnity Agreement.

Finally, NPI's argument as to Natrol's negligence is inapposite. NPI did not raise an affirmative defense of negligence—or otherwise address negligence—in its Answer. See [DE 109]. Therefore, it cannot raise that defense to liability under the Indemnity Agreement for the first time at summary judgment.[16] See *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir.2010) ("Failure to plead an affirmative defense generally results in a waiver of that defense").

In sum, the Indemnity Agreement requires NPI to indemnify Natrol for certain losses. Nevertheless, as addressed, *infra*,

genuine disputes of fact remain as to the calculation of those losses.

### 3. Breach of Express Warranty

■ Natrol seeks summary judgment on its claim against NPI for breach of express warranty. Under Florida law, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Fla. Stat. § 672.313(1)(a). "An express warranty is generally considered to arise only where the seller asserts a fact of which the buyer is ignorant prior to the beginning of the transaction and on which the buyer justifiably relies as part of the basis of the bargain." *Thursby v. Reynolds Metals Co.*, 466 So.2d 245, 250 (Fla. 1st DCA 1984) (internal citations and quotations omitted).

■ As previously stated, the record reveals genuine disputes as to the terms of the parties' contract(s) for the manufacture of the ProLab Products. The parties even disagree as to the operative documents memorializing their contract(s). In light of these disputes, it is unclear whether NPI affirmed or promised *prior to the beginning of the transaction* that the ProLab Products would be wheat/gluten

---

14. Depending on the terms of the parties' contract for the manufacture of the ProLab Products—which, as stated, *supra*, are still in dispute—Natrol may have faced some liability to NPI. Assuming the parties' contract did not initially require wheat/gluten free products, NPI may even have been able to compel specific performance of all pending orders and provided the ProLab Products to Natrol at full cost. Or NPI may have been able to charge Natrol for all manufacturing costs to that point. In any case, NPI would have been protected against liability under the Indemnity Agreement.

15. Additionally, even if Natrol had constructive knowledge that Century Foods's gluta-

mine peptide included wheat/gluten—a finding which is not clear from the record—NPI would still be liable under the broad terms of the Indemnity Agreement. NPI certified that the exact ingredients it was using—including the glutamine peptide—did not have wheat/gluten. There is no genuine dispute that Natrol has suffered at least some damages that are "in *any* manner related to" that certification.

16. In any case, there is no evidence that Natrol owed NPI a duty to independently know or verify the information requested by Natrol in the Questionnaires.

free.[17] Accordingly, Natrol is not entitled to summary judgment on this claim.

### 4. Breach of Implied Warranty of Merchantability

 Natrol seeks summary judgment on its claim against NPI for breach of the implied warranty of merchantability. "A warranty that 'goods shall be merchantable'—i.e., 'fit for the ordinary purposes for which such goods are used'—is implied in any contract for the sale of goods if the seller is a merchant with respect to goods of that kind." *Jovine v. Abbott Labs.*, 795 F.Supp.2d 1331, 1340 (S.D.Fla.2011) (quoting Fla. Stat. § 672.314). "A cause of action for breach of implied warranty of merchantability requires allegations that (1) the plaintiff was a foreseeable user of the product, (2) the product was used in the intended manner at the time of the injury, (3) the product was defective when transferred from the warrantor, and (4) the defect caused the injury." *Id.* (citing *Amoroso v. Samuel Friedland Family*, 604 So.2d 827, 833 (Fla. 4th DCA 1992)).

 Natrol has satisfied the elements for NPI's liability under this cause of action; however, material issues remain as to the appropriate damages. It is undisputed that Natrol was a foreseeable user of the ProLab Products, that those Products were intended for distribution/resale by Natrol, that the Products did not conform with, at a minimum, the representations in the Questionnaires, and that Natrol distributed those Products as intended. Nevertheless, genuine disputes remain as to the degree of injuries that flowed from that breach.

### 5. Breach of Warranty of Fitness for a Particular Purpose

 Natrol seeks summary judgment on its claim for breach of warranty of fitness for a particular purpose. To prevail on this cause of action, "[a] plaintiff must prove that the defendant, at the time the sale was made, knew of a particular purpose for which the goods were going to be used and that the plaintiff relied upon the defendant's skill and judgment when purchasing said product." *Pavletic v. Bertram Yacht, Inc.*, No. 11–60484–CIV, 2011 WL 3475394, at *7 (S.D.Fla. Aug. 9, 2011).

 The first factor is satisfied. It is undisputed that, at all relevant times, NPI knew of Natrol's purpose of selling the ProLab Products with labels indicating that the Products were wheat and gluten free. *See* [DE 203 ¶¶ 7, 10; DE 234 at 3–6]. However, there are genuine disputes as to the second factor. As already stated, it is unclear which documents memorialize the parties' contract(s) or what terms those contract(s) included. Consequently, it is unclear if, at the outset of the contract(s), Natrol relied on NPI's skill and judgment to know the contents of each ingredient for the ProLab Products, including glutamine peptide. A reasonable jury could find that the contract(s) required NPI only to create the ProLab Products according to Natrol's exact specifications and then to affix the Products with Natrol's labels. Under those circumstances, Natrol—when it purchased the Products—would not have relied upon NPI's skill and judgment with respect to the gluten and wheat free aspect. Alter-

---

17. NPI certainly made such a promise through the Questionnaires. However, NPI did not complete the Questionnaires prior to the beginning of the transaction. Natrol alleges—and NPI does not dispute—that "NPI manufactured the [ProLab Products] from July, 2009 through August, 2011" but that the NPI returned the Questionnaires in March, 2010. [DE 203 ¶¶ 7, 20; DE 234 at 3–6]. Therefore, it is unclear when the enforceable contract began.

natively, a reasonable jury could find that the contract(s) incorporated the original labels, as well as a certification by NPI that the completed ProLab Products would conform to those labels. In that case, Natrol would have relied on NPI's skill and judgment as to creating Products that were gluten/wheat free. Thus, genuine issues of fact remain for the jury, and summary judgment is not warranted as to this claim.

### 6. *Violation of FDUTPA*

Natrol seek s summary on its claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). "A claim under FDUTPA has three elements: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages." *Siever v. BWGaskets, Inc.*, 669 F.Supp.2d 1286, 1292 (M.D.Fla.2009). "Whether particular conduct constitutes such an unfair or deceptive trade practice is a question of fact". *Id.* at 1293 (citing *Suris v. Gilmore Liquidating, Inc.*, 651 So.2d 1282, 1283 (Fla. 3d DCA 1995)). "[A] claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships." *Id.* "A practice will be deemed 'unfair' when it 'offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, (or competitors or other businessmen).'" *Hanson Hams, Inc. v. HBH Franchise Co., LLC,* No. 03–61198–CIV, 2003 WL 22768687, at *2 (S.D.Fla. Nov. 7,

2003) (quoting *Day v. Le–Jo Enters., Inc.*, 521 So.2d 175, 178 (Fla. 3rd DCA 1988)).

Genuine disputes of material fact remain as to this claim. The relevant deceptive act or unfair practice would be NPI's inaccurate representation on the Questionnaires that the ProLab Products would be wheat/gluten free. Whether that conduct constitutes an unfair or deceptive trade practice is a question of fact for the jury to determine. Moreover, if that conduct were unfair or deceptive, the jury must determine to what extent the conduct caused Natrol's actual—and not consequential—damages.[18] Consequently, Natrol is not entitled to summary judgment on this claim.

### 7. *Violations of Lanham Act*

Natrol argues that it is entitled to summary judgment on its claim for false advertising under the Lanham Act. In response, NPI asserts that Natrol lacks prudential standing to assert a Lanham Act claim. For the following reasons, the Court agrees.

With respect to prudential standing to assert a false advertising claim under § 43(a) of the Lanham Act, the Eleventh Circuit has held that a court should consider the following factors:

> (1) The nature of the plaintiff's alleged injury: Is the injury of a type that Congress sought to redress in providing a private remedy for violations of the [Lanham Act]?

---

**18.** Actual damages "are defined as the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Terrell v. DIRECTV, LLC,* No. 12–81244–CIV, 2013 WL 451914, at *3 (S.D.Fla. Feb. 6, 2013) (internal quotations omitted). "The term 'actual damages' does not include special or consequen-

tial damages." *Id.* (internal quotations omitted). In the instant case, the factual question of actual damages may be particularly convoluted if the relevant deceptive act—the completion of inaccurate Questionnaires—occurred after Natrol had previously agreed to purchase the Products based on terms irrespective of the information contained in the Questionnaires.

(2) The directness or indirectness of the asserted injury.

(3) The proximity or remoteness of the party to the alleged injurious conduct.

(4) The speculativeness of the damages claim.

(5) The risk of duplicative damages or complexity in apportioning damages.

*Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1163–64 (11th Cir. 2007). With respect to the first factor, "the purpose of the Lanham Act is to protect commercial interests from a competitor's false advertising and to protect the business community from having its reputation and goodwill diverted." *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1331 (11th Cir.2008). Under the second factor, "a typical false advertising claim is one where a plaintiff alleges that it lost sales and/or market share as a result of the defendant's false or misleading representations about some characteristic of the defendant's product or services." *Id.* at 1332. The third factor requires consideration of whether there is an " 'identifiable class' of persons that is more proximate to the claimed injury" than the plaintiff. *Phoenix*, 489 F.3d at 1171. The fourth and fifth factors address whether the plaintiff's damages are speculative and whether there would be either duplicative damages for other plaintiffs or complexity in apportioning damages. *Id.* at 1171–73.

██ These factors confirm that Natrol does not have standing to assert its Lanham Act claim.[19] False advertising claims under the Lanham Act protect the competitors or consumers who were harmed by

the defendant's false advertising. Here, Natrol has not suffered that type of injury. Its competitor did not advertise and sell a product on the market with misleading claims that siphoned customers away from Natrol.[20] Rather, Natrol put a product into the marketplace with misleading claims of being wheat and gluten free. Had Natrol failed to recall that Product, Natrol's competitors or consumers may have had valid Lanham Act claims against Natrol. Natrol, as the seller of the product, cannot bring those claims against its own manufacturer. And Natrol fails to cite to any precedent directly indicating that a seller/reseller can bring a Lanham Act claim against its own manufacturer.

Accordingly, the nature of Natrol's injury is not the type Congress sought to address through the Lanham Act. Moreover, Natrol is remotely related—at least as a victim—to any injurious conduct that is capable of redress through a false advertising claim. Any damages for false advertising should more appropriately flow to Natrol's consumers or competitors who were harmed by the distribution of ProLab Products that were inaccurately branded as being wheat and gluten free. Natrol's damages can be addressed through Natrol's other causes of action.

Thus, because Natrol does not have prudential standing, NPI is entitled to summary judgment on this claim.

8. *Damages for Breach of the Indemnity Agreement and Breach of Implied Warranty of Merchantability*

For the reasons stated, *supra*, the Court finds that Natrol is entitled to summary

---

19. In the alternative, notwithstanding the issue of standing, Natrol has failed to establish a claim under the Lanham Act.

20. Although NPI's subsidiary, Champion, may compete with Natrol's ProLab brand, the instant dispute does not arise from that competition. Natrol does not claim that NPI or

Champion falsely advertised a product or otherwise misled consumers to gain a competitive advantage over Natrol's ProLab brand. Rather, Natrol claims that NPI manufactured a product on Natrol's behalf that caused Natrol to distribute an inaccurately labeled product to third parties.

judgment as to liability under its claims for breach of the indemnity agreement and breach of implied warranty of merchantability. Nevertheless, genuine issues of material fact remain as to the damages stemming from those claims.

Natrol argues that it has suffered damages of $4,524,029.00 over and above a full setoff of NPI's claimed damages of $1,112,167.00 for unpaid invoices. In support, Natrol relies on expert testimony that the recall has caused damages through product refunds, direct expenses, expected increases in insurance premiums, and costs to rehabilitate the brand. [DE 209–4; DE 209–5; DE 209–6;]. On the other hand, NPI relies on rebuttal expert testimony that Natrol's lost profits analysis is flawed and that Natrol's claims of damage to the brand and costs for rehabilitation are unsupported. [DE 191–1]. More specifically, NPI's expert asserts, *inter alia,* that Natrol erroneously utilized only one month and eleven days of sample revenues—which were substantially higher than average historical revenues—to calculate total revenues that would have occurred over a multi-year period "but for" the recall. [*Id.* at 8–13]. Moreover, NPI's expert asserts that Natrol failed to take into account that operating costs would likely fluctuate in conjunction with fluctuating revenues and that Natrol could have mitigated damages through new manufacturing relationships and sales. [*Id.* at 14–15]. NPI's expert additionally asserts that there is not adequate analysis or documentation either to demonstrate that the recall impacted Natrol's ProLab brand or to support the estimated costs for rebranding. [*Id.* at 17–20]. Finally, NPI's expert utilizes data from similar companies to estimate that the value of the entire ProLab line is between $990,000 to $1,440,000, which is substantially less than Natrol's estimate for lost profits. [*Id.* at 20–21].

 This evidence creates genuine issues as to the calculation of Natrol's damages. Disputes remain as to Natrol's actual damages, consequential damages, and failure to mitigate damages. Moreover, Natrol's liability to NPI—which would offset Natrol's damages—remains unresolved. Accordingly, the Court will not weigh the competing evidence as to the appropriate damages. The jury must resolve those factual disputes.[21] *See, e.g., Total Mktg. Techs., Inc. v. Angel Med-Flight Worldwide Air Ambulance Servs., LLC,* No. 8:10–cv–2680–T–33TBM, 2012 WL 2912515, at *6 (M.D.Fla. July 16, 2012) ("It is not the province of this Court, on a motion for summary judgment, to weigh the credibility of this evidence [as to damages]. The Court finds that [plaintiff] has raised genuine issues of fact that preclude partial summary judgment as to damages."); *Aery v. Wallace Lincoln–Mercury, LLC,* 118 So.3d 904, 916 (Fla. 4th DCA 2013) ("Because there are disputed issues of fact, summary judgment was inappropriate on the issue of mitigation of damages in this case.").

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff/Counterclaim Defendant NPI's Motion for Summary Judgment [DE 212] is **GRANTED IN PART AND DENIED IN PART:**

2. Plaintiff/Counterclaim Defendant NPI's Motion for Summary Judgment [DE 212] is **GRANTED** as to

---

**21.** Genuine disputes of material fact as to damages will remain even if the Court subsequently determines that either party's expert testimony is inadmissible. Regardless of whether the parties' expert testimony is presented at trial, a reasonable jury could reach a wide range of conclusions as to the factual issue of damages.

Count VI (Civil Remedies for Violations of Lanham Act) of Defendant/Counterplaintiff Natrol's Counterclaims [DE 47];

3. Plaintiff/Counterclaim Defendant NPI's Motion for Summary Judgment [DE 212] is **DENIED** in all other respects;

4. Defendant/Counterplaintiff Natrol's Motion for Summary Judgment [DE 202] is **GRANTED IN PART AND DENIED IN PART;**

5. Defendant/Counterplaintiff Natrol's Motion for Summary Judgment [DE 202] is **GRANTED** as to liability only on Count I (Breach of the Indemnity Agreement) and Count III (Breach of Implied Warranty of Merchantability) of Defendant/Counterplaintiff Natrol's Counterclaims [DE 47], with damages to be determined at trial;

6. Defendant/Counterplaintiff Natrol's Motion for Summary Judgment [DE 202] is **DENIED** in all other respects; and

7. Judgment shall be entered by a separate order at the close of proceedings.

## ORDER DENYING MOTION FOR RECONSIDERATION

THIS CAUSE is before the Court on Nature's Products, Inc.'s Motion for Reconsideration of Omnibus Order Re Cross Motions for Summary Judgment (the "Motion") [DE 315], filed herein on September 26, 2013. The Court has carefully considered the Motion [DE 315], the Supplement [DE 324], the Response [DE 326], the Reply [DE 332], and the Second Supplement [DE 335]. The Court is otherwise fully advised in the premises.[1]

1. The Court will utilize herein various terms as defined in its Omnibus Order Denying and

## I. *STANDARD OF REVIEW*

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Burger King Corp. v. Ashland Equities, Inc.,* 181 F.Supp.2d 1366, 1369 (S.D.Fla.2002) (internal citations omitted). Three major grounds justify reconsideration: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." *Id.* (citing *Office Togolais Des Phosphates v. Mulberry Phosphates, Inc.,* 62 F.Supp.2d 1316, 1331 (M.D.Fla.1999); *Sussman v. Salem Saxon & Nielsen, P.A.,* 153 F.R.D. 689, 694 (M.D.Fla.1994)). For a court to reconsider its prior judgment, the moving party must present facts or law of a "strongly convincing nature" that would induce a court to reverse its prior decision. *Cover v. Wal–Mart Stores, Inc.,* 148 F.R.D. 294, 295 (M.D.Fla.1993) (citing *Sussman,* 153 F.R.D. at 694). Accordingly, a motion for reconsideration is an "extraordinary remedy to be employed sparingly." *Burger King Corp.,* 181 F.Supp.2d at 1370 (citing *Mannings v. Sch. Bd. of Hillsborough Cnty.,* 149 F.R.D. 235, 235 (M.D.Fla.1993)).

## II. *DISCUSSION*

Nature's Products, Inc. ("NPI") asserts four arguments in support of its Motion [DE 315]. First, NPI asserts that the Court erred in finding that NPI did not raise Natrol's negligence as an affirmative defense to avoid contractual liability. Second, NPI asserts that the Court overlooked that Natrol recalled the ProLab Products for failing to disclose milk allergens. Third, NPI asserts that the Court

Granting, In Part, Cross Motions for Summary Judgment [DE 312, 330].

misapplied aspects of the law on implied warranty of merchantability. Fourth, NPI argues that the Court erred in finding that NPI returned the Questionnaires, as completed by NPI's Regulatory and Compliance Manager, to Natrol in March 2010.

For the following reasons, the Court will not alter its previous rulings. NPI is simply relitigating issues already determined. *See Mincey v. Head,* 206 F.3d 1106, 1137 n. 69 (11th Cir.2000) ("The function of a motion to alter or amend a judgment is not to serve as a vehicle to relitigate old matters or present the case under a new legal theory ... [or] to give the moving party another bite at the apple by permitting the arguing of issues and procedures that could and should have been raised prior to judgment.").

With respect to negligence as an affirmative defense, the court held as follows: "NPI did not raise an affirmative defense of negligence—or otherwise address negligence—in its Answer. Therefore, it cannot raise that defense to liability under the Indemnity Agreement for the first time at summary judgment." [DE 312 at 16]. The Court reiterates this holding. At summary judgment, NPI asserted the specific argument that an indemnity agreement must include clear and express language in order to permit a party to receive indemnification for its own negligence. *See* [DE 234 at 14–15]. The Court determined that this defense to any liability under the Indemnity Agreement was not raised in NPI's Answer [DE 109]. Accordingly, the Court declined to consider whether any negligence by Natrol precluded all recovery otherwise available through a valid Indemnity Agreement. NPI has not shown that this specific defense—regarding Natrol's acts constituting negligence and negligence being outside the scope of the Indemnity Agreement—was raised in its Answer [DE 109].

Moreover, the Court reiterates that its holding—e.g., that there is no genuine dispute that Natrol has suffered at least some damages that are in any manner related to NPI's misrepresentation in the Questionnaires—does not foreclose NPI from litigating the amount of damages caused by NPI's misrepresentation. In other words, Natrol's own conduct is still relevant, as is NPI's First Affirmative Defense. Natrol may have caused the vast majority of its own damages arising from the recall. And Natrol's damages arising from or in connection to or in any manner related to NPI's misrepresentation on the Questionnaires may be nominal. Those genuine disputes remain for trial. However, NPI cannot invalidate the whole of the Indemnity Agreement based on a specific argument about contractual language and negligence raised for the first time at summary judgment.

Next, NPI's arguments as to milk allergens and the Questionnaires do not merit reconsideration. NPI agreed to indemnify Natrol. NPI subsequently misrepresented material facts on Questionnaires. Natrol subsequently suffered damages. The Court did not conclude that all of Natrol's damages stemmed from the representations/certifications in the Questionnaires. Rather, the Court concluded that Natrol suffered at least some damage connected to the Questionnaires. NPI can still attempt to negate the degree that Natrol relied on the Questionnaires and to show that Natrol's damages arising from the Questionnaires—and not from another cause—are minimal. In so doing, NPI can rely on any admissible evidence as to Natrol's treatment of milk allergens vis-à-vis the ProLab Products.

With respect to the implied warranty of merchantability, NPI impermissibly attempts to raise nuanced exceptions that NPI failed to raise during the summary judgment briefing. The Court will not

grant NPI a second bite at the apple and now consider those exceptions. However, NPI is free at trial to litigate the issue of the amount of damages that flowed from NPI's breach of its warranty—as conveyed in the Questionnaires—that the ProLab Products were wheat/gluten free.

Finally, NPI cannot now contest the factual circumstances surrounding the completion of the Questionnaires. Natrol's Statement of Material Facts included the factual assertion that the Questionnaires were completed in March 2010 by NPI's Regulatory and Compliance Manager. *See* [DE 203 ¶ 20]. There was record support for that assertion. *See, e.g.,* [DE 47–3; 203–3 at 11–12]. NPI had an opportunity to contest Natrol's Statement of Material Facts but declined to contest that particular fact. *See* [DE 234 at 3–6]. The Court incorporated that fact into its decision at summary judgment. NPI cannot now point to alternate evidence to dispute a fact which it effectively conceded at the summary judgment stage.

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that the Motion [DE 315] is **DENIED.**

**DONE AND ORDERED.**