# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NUVASIVE, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2017-0720-SG |
| PATRICK MILES, an individual, and ALPHATEC HOLDINGS, INC., a Delaware Corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: May 22, 2020
Date Decided: August 31, 2020

Aaron P. Sayers, of MCDERMOTT WILL & EMERY LLP, Wilmington, Delaware; OF COUNSEL: Rachel B. Cowen, Michael J. Sheehan, J. Christian Nemeth, and Emory D. Moore, Jr., of MCDERMOTT WILL & EMERY LLP, Chicago, Illinois; Christopher W. Cardwell, of GULLET, SANFORD, ROBINSON & MARTIN, PLLC, Nashville, Tennessee, *Attorneys for Plaintiff NuVasive, Inc*.

Philip A. Rovner and Jonathan A. Choa, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Frank Earley, of MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, P.C., New York, New York; Micha Danzig, Eric J. Eastham, and Paul M. Huston, of MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, P.C., San Diego, California, *Attorneys for Defendant Alphatec Holdings, Inc*.

GLASSCOCK, Vice Chancellor

The Plaintiff, NuVasive, Inc. ("NuVasive") specializes in spinal surgery support; one of the Defendants, Alphatec Holdings, Inc. ("Alphatec") is a direct competitor of NuVasive. The heart of the dispute involves allegations that a NuVasive fiduciary, Defendant Patrick Miles, developed a scheme while working at NuVasive to decamp to Alphatec, taking confidential information, employees, and customers with him. At the time he became an Alphatec employee, Miles had just resigned as Vice Chairman of NuVasive and as a member of NuVasive's Board of Directors; he had recently served as President and COO of NuVasive.

NuVasive brought this Action against Miles and Alphatec, the current operative pleading is its Second Amended Complaint for Damages (the "SAC"). NuVasive's litigation position is complicated by the fact that, although Miles had agreed to a non-compete agreement, that agreement is void under California law.[1]

Currently before me is Alphatec's Motion to Dismiss. Alphatec is charged in the SAC with unfair competition, tortious interference with contract, tortious interference with prospective economic advantage, aiding and abetting breach of fiduciary duty, and deceptive and unfair trade practices under Florida and North Carolina law; all resulting from the scheme described above. I examine the allegations regarding each tort in light of the Motion to Dismiss, with mixed results for the movant. My reasoning is below.

---

[1] *NuVasive, Inc. v. Miles*, 2019 WL 4010814 (Del. Ch. Aug. 26, 2019).

1

# I. BACKGROUND[2]

*A. The Parties*

Plaintiff NuVasive is a Delaware corporation headquartered in San Diego, California.[3] NuVasive is a publicly-traded company and is in the spine surgery industry.[4]

Defendant Alphatec is a Delaware corporation headquartered in Carlsbad, California.[5] Alphatec is a competitor of NuVasive.[6]

Defendant Patrick Miles was employed at NuVasive for seventeen years, rising to the position of President and Chief Operating Officer, and was later appointed a member of NuVasive's Board of Directors and Vice Chairman.[7] Miles later joined Alphatec as its Executive Chairman, and later Chief Executive Officer.[8]

*B. NuVasive Evaluates a Potential Acquisition of Alphatec; Miles's Employment Agreement with NuVasive*

Miles served as NuVasive's President and Chief Operating Officer through September 2016—while Miles was serving in such capacity, NuVasive evaluated an

---

[2] The facts, except where otherwise noted, are drawn from the Plaintiff's Second Amended Complaint for Damages, D.I. 234 (the "Second Amended Complaint" or "SAC"), and exhibits or documents incorporated therein, and are presumed true for the purposes of Alphatec's Motion to Dismiss.

[3] SAC, ¶ 8.

[4] *Id.*

[5] *Id.* ¶ 11.

[6] *Id.* ¶ 3.

[7] *Id.* ¶ 10.

[8] *Id.* ¶ 52.

opportunity to pursue an acquisition of Alphatec.[9]  Miles was heavily involved in the potential acquisition process and due to Miles's long history in the product development side of NuVasive's business, Miles's evaluation and recommendation regarding Alphatec was given substantial weight by NuVasive.[10]  Internally within NuVasive, Miles expressed the opinion that the Alphatec acquisition opportunity was a "waste of time" and that Alphatec was a "poor acquisition target."[11]  Miles remarked that an analysis stating that Alphatec had an "[a]ged, undifferentiated portfolio" was "dead on the mark."[12]  Consistent with Miles's recommendations, NuVasive decided not pursue an acquisition of Alphatec.[13]

Around this time, Miles expressed a desire to have more input and control regarding NuVasive's strategic direction, and consequent to this desire Miles was appointed to NuVasive's Board of Directors in August 2016.[14]  Shortly after joining NuVasive's Board of Directors, Miles disclosed that we was considering accepting an employment offer from Alphatec.[15]

Miles leveraged the Alphatec offer to negotiate a new employment agreement with NuVasive, executed on September 11, 2016, to remain with NuVasive as its

---

[9] *Id.* ¶¶ 15–16.
[10] *Id.* ¶ 17.
[11] *Id.* ¶¶ 18–19.
[12] *Id.* ¶ 19.
[13] *Id.* ¶ 20.
[14] *Id.* ¶ 21.
[15] *Id.* ¶ 22.

Vice Chairman (the "Letter Agreement").[16]  Miles made it known that he wanted reduced day-to-day responsibilities in order to spend more time with his family and did not want the workload associated with a high-level management position with NuVasive or Alphatec.[17]  As NuVasive's Vice Chairman, Miles would remain involved with high-level business strategy, product development, and maintaining key customer and partner relationships, but would largely be relieved of day-to-day management responsibilities.[18]  Miles's new employment agreement included a compensation package providing (1) a $500,000 annual salary, (2) an equity award valued in excess of $3.7 million, and (3) continued vesting of earlier equity grants.[19] Miles also remained on NuVasive's Board of Directors.[20]

The Letter Agreement included certain restrictive covenants applicable to Miles.  Miles agreed that "for a one year period following the termination of [his] employment for any reason, [Miles] will not provide any services to any business operating in any line or type of business conducted by NuVasive or its subsidiaries."[21]  Additionally, "for that same one year period," Miles agreed that he "will not hire or solicit, directly or indirectly, any former or current employees of NuVasive, its subsidiaries and/or distributors, or solicit the business of any

---

[16] *Id*.; SAC, Ex. A ("Letter Agreement").
[17] SAC, ¶ 24.
[18] *Id*. ¶ 23.
[19] *Id*. ¶ 22.
[20] *Id*.
[21] Letter Agreement, at 2; SAC, ¶ 26.

4

customers, clients, medical partners (including physicians utilizing NuVasive's products and services) of NuVasive, its subsidiaries and/or distributors."[22] The Letter Agreement is "governed by the laws of the State of Delaware, without regard for choice of law provisions."[23]

After Miles agreed to the Letter Agreement, NuVasive continued to trust Miles with its most confidential business information including acquisition targets, product development timelines and launch windows, domestic and international growth and expansion plans, key customer and surgeon relationships, and NuVasive's 5-year strategic plan.[24] Miles assured NuVasive of his loyalty to the company, telling NuVasive's Board of Directors that he "bleeds purple"—purple being a core part of NuVasive's image, branding, and marketing.[25]

### C. Miles's Investment in Alphatec; Miles Resigns from NuVasive and Joins Alphatec

On March 22, 2017, Miles executed a securities purchase agreement to purchase $500,000 of Alphatec stock in a private placement.[26] Alphatec's press

---

[22] Letter Agreement, at 2; SAC, ¶ 26.

[23] Letter Agreement, at 3; SAC, ¶ 27. In a previous Memorandum Opinion in this matter I found the Delaware choice-of-law provision to be unenforceable with regard to the non-solicitation and non-competition covenants. *NuVasive, Inc. v. Miles*, 2019 WL 4010814, at *7 (Del. Ch. Aug. 26, 2019).

[24] SAC, ¶ 32.

[25] *Id.* ¶ 34.

[26] *Id.* ¶ 36.

release announcing the private placement sale reflected that the purpose of the sale was to enable Alphatec to more effectively compete in the spinal surgery business.[27]

NuVasive's Code of Conduct, in place at the time of the private placement sale provided: "To be sure we are keeping NuVasive's best interests at heart, we should not have a significant investment in a customer, supplier or competitor. Large investments in these organizations could divide our interests and make it difficult for us to act in the best interests of our Company."[28] Miles's investment in Alphatec—which Miles made through an entity called "MOM"—was not disclosed by Miles or Alphatec.[29]

During this time, Miles and Alphatec were engaged in discussions for Miles to become Alphatec's "leader."[30] Miles did not disclose these discussions to NuVasive, all the while Miles remained part of ongoing discussions and disclosures of NuVasive's most confidential business strategies and other information.[31] Around this time and throughout his tenure as Vice President of NuVasive, Miles disparaged NuVasive and key members of its management to critical NuVasive customers, medical partners, and employees.[32] In June 2017, Miles sold 15,000

---

[27] *Id.* ¶ 37.
[28] *Id.* ¶ 38.
[29] *Id.* ¶¶ 36, 39.
[30] *Id.* ¶ 40.
[31] *Id.*
[32] *Id.* ¶ 41.

shares of NuVasive stock, the proceeds of which exceeded $1 million.[33] In September 2017, Miles contacted a NuVasive customer and respected spinal surgeon and informed him that Miles was considering an offer to join Alphatec—Miles sought the surgeon's advice regarding Alphatec's offer.[34]

While still employed at NuVasive, Miles negotiated to secure an additional equity stake in Alphatec.[35] On October 1, 2017, Miles disclosed to NuVasive that he was resigning effective immediately and that he would assume the position of Executive Chairman of Alphatec the following day.[36]

On October 2, 2017, Alphatec announced that Miles had been appointed Executive Chairman of Alphatec, and that Miles would lead the company.[37] As part of Miles's agreement to join Alphatec, Miles agreed to purchase an additional 1.3 million Alphatec shares (valued at $2,938,000), was granted 1,000,000 Restricted Stock Units, and received warrants to purchase up to an additional 1.3 million shares of Alphatec.[38] Alphatec's press release noted that Miles would be "fully engaged, focusing primarily on further defining and implementing Alphatec's strategic

---

[33] *Id.* ¶ 42.
[34] *Id.* ¶ 43.
[35] *Id.* ¶ 45.
[36] *Id.* ¶ 46.
[37] SAC, Ex. B, at 1.
[38] SAC, ¶ 45. The Restricted Stock Units had a market value of $3.22 million as of market close on October 2, 2017. *Id.*

initiatives, expanding and fortifying the Company's relationships with surgeon customers, and leading Alphatec's new technology development."[39]

*D. Miles Recruits Former NuVasive Executives, NuVasive Employees, and Medical Advisors*

Alphatec's executive team and Board of Directors is composed of many former NuVasive employees—four of the six members of Alphatec's Executive Team and four of the nine members of Alphatec's Board of Directors are recent employees of NuVasive.[40] Brian Snider, a former NuVasive employee who became Alphatec's Executive Vice President Strategic Marketing and Product Development in March 2017, had agreed to a Proprietary Information and Inventions Agreement (the "PIIA") with NuVasive, pursuant to which Snider owed post-employment obligations to NuVasive.[41]

Upon joining Alphatec, Miles began recruiting former NuVasive employees, including at least thirteen former NuVasive employees who now work at Alphatec.[42] Miles also successfully recruited two longtime NuVasive clinical advisors and design surgeons to modify their longstanding business relationships with NuVasive

---

[39] SAC, Ex. B, at 1.
[40] SAC, ¶ 50.
[41] *Id.* ¶¶ 52–53. Pursuant to the PIIA, until March 24, 2018, Snider owed NuVasive a duty not to "induce or influence, or seek to induce or influence, any person who is employed or engaged by [NuVasive] (as an agent, employee, independent contractor, or in any other capacity), or any successor thereto, with the purpose of obtaining such person as an employee or independent contractor for a business competitive with [NuVasive], or causing such person to terminate his or her employment agency or relationship with [NuVasive], or any successor thereto." *Id.* ¶ 53.
[42] *Id.* ¶ 54.

8

and assume similar roles with Alphatec.[43] One of these advisors, Dr. Luiz Pimenta, had a Second Amended and Restated Clinical Advisor Agreement with NuVasive (the "Pimenta Agreement").[44] The Pimenta Agreement provides that during the term of the agreement, Dr. Pimenta is prohibited from: "(a) performing any service for any third-party which may utilize any of the information obtained from NuVasive . . . and (b) working with any other party with respect to similar products or similar systems for which [Pimenta] receives (or stands to receive) royalties under [the Pimenta Agreement]."[45]

*E. Distributors and Distributor Representatives*

Immediately following Alphatec's hiring of Miles, Alphatec contacted NuVasive's distributors in an attempt to induce such distributors to assume similar distributor or sales roles for Alphatec.[46] Alphatec told these distributors that NuVasive intended to terminate their contracts or convert them into direct employees.[47] This effort resulted in the loss of a NuVasive distributor and a number of distributor representatives.[48]

---

[43] *Id.* ¶ 55.

[44] *Id.* ¶¶ 55–56; *see* SAC, Ex. D.

[45] SAC, Ex. D, § 2.A.

[46] SAC, ¶ 58.

[47] *Id.* The SAC pleads on information and belief that Alphatec offered distributors "bounty commissions" for terminating their relationship with NuVasive and "converting NuVasive's business." *Id.*

[48] *Id.* ¶ 59.

9

## 1. Absolute Medical

Absolute Medical, LLC ("Absolute Medical") became a Florida-based exclusive distributor of NuVasive's products on February 14, 2013.[49] Absolute Medical and NuVasive entered into the January 1, 2017 Exclusive Sales Representative Agreement (the "Absolute Agreement") as amended by the July 1, 2017, Territory Transition Agreement (the "Transition Agreement").[50] The Absolute Agreement appoints Absolute Medical as NuVasive's "exclusive sales representative" in the "Territory" for the "Term" (until January 1, 2022).[51] The "Territory" is composed of eight counties and one hospital in the State of Florida.[52] In accordance with the Absolute Agreement, Absolute Medical hired a staff of sales representatives (the "Representative Affiliates") to assist in promoting NuVasive's products in its sales territory.[53]

In connection with its position as an exclusive distributor for NuVasive, Absolute Medical received training and had access to and knowledge of NuVasive's trade secrets and other proprietary information.[54] The Absolute Agreement contains

---

[49] *Id.* ¶ 60.

[50] *See* SAC, Ex. E; SAC, Ex. F.

[51] SAC, Ex. E, § 1.01.

[52] SAC, Ex. F, Annex II. The counties are: Flagler, Volusia, Lake, Seminole, Osceola, Orange, Highlands, and Brevard. *Id.* Three hospitals are excluded from Brevard County (Wuesthoff Medical Center Melbourne, Holmes Regional Medical Center, and Palm Bay Hospital), and the single hospital is in Polk County (Heart of Florida Regional Medical Center). *Id.*

[53] SAC, ¶ 61; *see* SAC, Ex. E, § 5.03.

[54] SAC, ¶ 62.

non-compete and non-solicit obligations that require Absolute Medical and its Representative Affiliates not to compete for the same customers they solicited on NuVasive's behalf for one year after the Term (until January 1, 2023).[55] The Absolute Agreement also contains other obligations of Absolute Medical, including the obligation to advise NuVasive of any changes in Absolute Medical's "status, organization, personnel, and similar matters," a non-disclosure obligation, an agreement to indemnify NuVasive in certain circumstances, and a further assurances obligation.[56]

On November 27, 2017, Absolute Medical's president and sole member Greg Soufleris notified NuVasive of Absolute Medical's intent to "resign[]" from its "partnership" with NuVasive.[57] On November 30, 2017, Soufleris formed Absolute Medical Systems, LLC ("AMS"), a Florida limited liability company headquartered at the same address as Absolute Medical.[58] On December 1, 2017, AMS executed a contract with Alphatec to be its exclusive distributor of spinal products—NuVasive alleges on information and belief that Alphatec encouraged Soufleris to terminate the Absolute Agreement with the understanding that Alphatec would sign an exclusive contract with a separate, newly formed, Absolute entity (AMS).[59]

---

[55] *Id.* ¶ 63; SAC, Ex. E, §§ 5.09(c), (e).
[56] SAC, ¶ 66; SAC, Ex. E, §§ 5.04, 8.01, 10.01, 12.04.
[57] SAC, ¶ 67; SAC, Ex. G, at 1.
[58] SAC, ¶ 69.
[59] *Id.* ¶ 70; SAC, Ex. H.

On December 5, 2017, Absolute Medical's counsel emailed NuVasive's counsel stating that three Representative Affiliates—Dave Hawley, Ryan Miller, and Brandon Gottstein—resigned from Absolute Medical.[60] Shortly thereafter, Hawley and Miller began selling Alphatec products as sales representatives for AMS, and Hawley, Miller, and Gottstein all became direct employees of Alphatec as sales representatives.[61] With Alphatec's encouragement, AMS and Hawley, Miller, and Gottstein now promote and/or sell Alphatec products to the same customers to whom they previously promoted and sold NuVasive products.[62]

On December 12, 2017, Hawley corresponded with a former NuVasive employee who now works for Alphatec about custom medical instruments.[63] The former NuVasive employee was subject to a temporary restraining order at the time which prohibited her from possessing NuVasive's materials.[64] Nonetheless, the email from Hawley provided Alphatec with precise descriptions of the medical instruments and promised to send the custom instruments NuVasive previously made to Alphatec so Alphatec could copy them.[65] Additionally, Soufleris has

---

[60] SAC, ¶ 71.
[61] *Id.* ¶ 72.
[62] *Id.* ¶ 73.
[63] *Id.* ¶ 74.
[64] *Id.* ¶ 75.
[65] *Id.* ¶ 74.

solicited business from at least two of Absolute Medical's NuVasive customers on Alphatec's behalf.[66]

To induce Absolute Medical to begin selling its products through the AMS entity, Alphatec promised to pay a greater sales commission to Absolute Medical than it received under the Absolute Agreement.[67] NuVasive alleges on information and belief that Alphatec is paying Absolute Medical and its Representative Affiliates an additional "bounty commission" for any NuVasive business it converts.[68] Alphatec's solicitation of Absolute Medical allegedly induced Hawley and Miller to solicit customers they solicited or serviced in connection with Absolute Medical's agreement with NuVasive.[69] Furthermore, NuVasive alleges on information and belief that Alphatec is indemnifying Absolute Medical, Soufleris, Hawley, and Miller for actions brought by NuVasive.[70]

## 2. inoSpine

inoSpine, LLC ("inoSpine") is a North Carolina limited liability company and was a North Carolina-based exclusive distributor for NuVasive.[71] inoSpine received

---

[66] *Id.* ¶ 76.
[67] *Id.* ¶ 77.
[68] *Id.*
[69] *Id.* ¶ 78.
[70] *Id.*
[71] *Id.* ¶ 79; SAC, Ex. J, at 1.

NuVasive's training and had access to and knowledge of NuVasive's trade secrets and other proprietary information.[72]

Around February 1, 2014, Michael Jones became an Independent Contractor of inoSpine and executed an Independent Contractor Agreement with inoSpine (the "Independent Contractor Agreement").[73] Jones's duties under the Independent Contractor Agreement included, "without limitation, promoting and selling products offered by [inoSpine], including sales support functions, providing services to healthcare providers to whom such products are sold, and such other duties as may be assigned by [inoSpine] from time-to-time."[74]

The Independent Contractor Agreement provides that during the term of the agreement and for one year following Jones's last day of employment, Jones "will not compete with [inoSpine] in [Jones's] Territory" by "[s]elling and/or promoting any products that are competitive with any products sold and/or promoted by [inoSpine] on the last day of [Jones's] employment and which [Jones] sold and/or promoted while employed by [inoSpine]."[75] Jones's Territory under the Independent Contractor Agreement consists of ten counties in North Carolina: Mecklenburg,

---

[72] SAC, ¶ 80.
[73] *Id.* ¶ 81; SAC, Ex. J.
[74] SAC, ¶ 81.
[75] *Id.* ¶ 82; SAC, Ex. J., § 8(A)(1).

Catawba, Haywood, Iredell, Cabarrus, Rowan, Gaston, Rutherford, Caldwell, and Burke.[76]

The Independent Contractor Agreement also imposes certain non-solicitation obligations on Jones.[77] Jones agreed "not compete with [inoSpine] by, in a competitive capacity":

> Soliciting or accepting business competitive to [inoSpine] from, or providing competing products and/or services to, any person or entity, from whom or which [Jones] accepted business on behalf of [inoSpine] or to whom or which [Jones] provided products and/or services on behalf of [inoSpine] during the one-year period preceding the last day of [Jones's] employment[.][78]

The Independent Contractor Agreement also provides that Jones will "not compete with [inoSpine] by, in a competitive capacity":

> Soliciting or accepting competing business from or providing competing products and/or services to, any person or entity from whom or which [Jones] personally solicited business on behalf of [inoSpine] during the three (3) month period immediately preceding the last day of [Jones's] employment.[79]

NuVasive is agreed to be a third party beneficiary of the Independent Contractor Agreement, "with full contractual and other rights to directly enforce" certain

---

[76] SAC, ¶ 83, SAC Ex. J, Schedule A.
[77] SAC, ¶ 84.
[78] *Id.*; SAC, Ex. J, § 9(A)(1).
[79] SAC, ¶ 84; SAC, Ex. J, § 9(A)(2).

provisions of the Independent Contractor Agreement, including the non-competition and non-solicitation provisions excerpted above.[80]

Around February 17, 2017, Kenneth Kormanis became an employee of inoSpine as a Spine Specialist and executed an Employment Agreement with inoSpine (the "Employment Agreement").[81] The Employment Agreement provides that during the term of the agreement and for a period of two years following Kormanis's last day of employment, Kormanis "will not compete with [inoSpine] in [Kormanis's] Territory" by "[s]elling and/or promoting any products that are competitive with any products sold and/or promoted by [inoSpine] on the last day of [Kormanis's] employment and which [Kormanis] sold and/or promoted while employed by [inoSpine]."[82] Kormanis's Territory under the Independent Contractor Agreement consists of four counties in North Carolina: Guilford, Forsyth, Stokes, and Rockingham.[83]

The Employment Agreement also imposes certain non-solicitation obligations on Kormanis.[84] Jones agreed "not compete with [inoSpine] within [Kormanis's] Territory, by, in a competitive capacity":

> Soliciting or accepting business competitive to [inoSpine] from, or providing competing products and/or services to, any person or entity,

---

[80] SAC, ¶ 85; SAC, Ex. J, § 10.
[81] SAC, ¶ 86; SAC, Ex. K.
[82] SAC, ¶ 88; SAC, Ex. K, § 8(A)(1).
[83] SAC, ¶ 89; SAC, Ex. K, Schedule A.
[84] SAC, ¶ 90.

16

from whom or which [Kormanis] accepted business on behalf of [inoSpine] or to whom or which [Kormanis] provided products and/or services on behalf of [inoSpine] during the one-year period preceding the last day of [Kormanis's] employment[.][85]

The Employment Agreement also provides that Kormanis will "not compete with [inoSpine] within [Kormanis's] Territory, by, in a competitive capacity":

> Soliciting or accepting competing business from or providing competing products and/or services to, any person or entity from whom or which [Kormanis] personally solicited business on behalf of [inoSpine] during the three (3) month period immediately preceding the last day of [Kormanis's] employment.[86]

NuVasive is agreed to be a third party beneficiary of the Employment Agreement, "with full contractual and other rights to directly enforce" certain provisions of the Employment Agreement, including the non-competition and non-solicitation provisions excerpted above.[87]

Around March 5, 2018 Jones and Kormanis terminated their respective independent contractor and employment relationships with inoSpine.[88] Alphatec solicited Jones and Kormanis to terminated their respective agreements with inoSpine and begin distributing Alphatec products.[89] Alphatec promised to pay Jones and Kormanis a greater sales commission than they received under their

---

[85] *Id.*; SAC, Ex. K, § 9(A)(1).
[86] SAC, ¶ 90; SAC, Ex. K, § 9(A)(2).
[87] SAC, ¶ 91; SAC, Ex. K, § 10.
[88] SAC, ¶ 92.
[89] *Id.* ¶ 93.

17

respective agreements with inoSpine.[90] NuVasive has alleged upon information and belief that Alphatec is paying Jones and Kormanis an additional "bounty commission" for "any NuVasive business they convert."[91] Alphatec also agreed to indemnify Jones and Kormanis with respect to any claims related to their contractual obligations to inoSpine and NuVasive.[92]

Jones and Kormanis are now affiliated with Alphatec and are promoting and/or selling Alphatec's competitive products within their former respective inoSpine territories.[93] Jones "converted at least one lateral surgery performed by one of his former inoSpine surgeon-customers to Alphatec."[94]

*F. The Second Amended Complaint and Procedural History*

The original complaint in this Action was filed on October 10, 2017, the SAC was filed on November 4, 2019. The SAC names two Defendants—Miles and Alphatec—and pleads a total of ten counts.[95] Six counts are pled against Alphatec: Counts IV, V, VI, VIII, IX, and X.[96]

Count IV claims unfair competition and alleges that Alphatec engaged in unfair competition by "unlawfully st[ealing] NuVasive's employees, distributors,

---

[90] *Id.* ¶ 94.
[91] *Id.*
[92] *Id.* ¶ 95.
[93] *Id.*
[94] *Id.* ¶ 96.
[95] *Id.* ¶¶ 98–165.
[96] *Id.*

18

customers, medical partners, technology and business strategies in an effort to unfairly compete against NuVasive."[97]

Count V claims tortious interference with contractual relations and alleges that Alphatec (along with Miles) "willfully interfered with NuVasive's contractual relationships by soliciting NuVasive's medical partners and distributors to terminate their relationships with NuVasive and accept engagement with Alphatec."[98]

Count VI claims tortious interference with prospective economic advantage and alleges that Miles "breached his non-competition and non-solicitation covenants by soliciting [NuVasive's employees, customers, distributors, and medical partners] to terminate their relationships with NuVasive and join Alphatec," and alleges that Alphatec's conduct is "malicious, intentional, without legal justification, and is done with the intent to injure NuVasive."[99]

Count VIII claims that Alphatec aided and abetted Miles's alleged breaches of fiduciary duty.[100]

Count IX claims deceptive and unfair trade practices under Florida law, and alleges that Alphatec unfairly competed with NuVasive and engaged in unfair and/or

---

[97] *Id.* ¶ 121.
[98] *Id.* ¶ 128.
[99] *Id.* ¶¶ 134–35.
[100] *Id.* ¶ 148.

deceptive acts and practices in its activities concerning Absolute Medical, AMS, Soufleris, and Absolute Medical's employees and sales representatives.[101]

Count X claims unfair and deceptive trade practices under North Carolina law, and alleges that Alphatec solicited and induced Jones and Kormanis to breach obligations to inoSpine by selling Alphatec's products, with knowledge of Jones and Kormanis's contractual obligations to inoSpine and NuVasive.[102]

Alphatec moved to dismiss the Counts IV, V, VI, VIII, IX, and X of the SAC on November 19, 2019.[103] I heard Oral Argument on May 22, 2020, and considered the matter submitted for decision on that date.

## II. ANALYSIS

Alphatec has moved to dismiss Counts IV, V, VI, VIII, IX, and X of the SAC under Chancery Court Rule 12(b)(6).[104] The standard for dismissal under Rule 12(b)(6) is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[105]

---

[101] *Id.* ¶ 154.
[102] *Id.* ¶ 161.
[103] Def. Alphatec Holdings, Inc.'s Mot. to Dismiss Pl.'s Second Am. Compl., D.I. 245.
[104] Ch. Ct. R. 12(b)(6).
[105] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

20

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[106]

*A. The SAC Pleads Facts Sufficient to Put Alphatec on Notice of the Claims Asserted Against It*

As an initial matter, Alphatec contends that all Counts asserted against it by NuVasive should be dismissed because Alphatec Holdings, Inc.—the entity referred to herein throughout as Alphatec—is "lump[ed] together" with its wholly owned subsidiary Alphatec Spine, Inc. ("Alphatec Spine") at the outset of the SAC and all allegations and claims are asserted against the agglomerated entities. Alphatec Spine was formerly a Defendant in this Action, but NuVasive opted to remove Alphatec Spine as a Defendant when it filed the SAC.[107] In Alphatec's contention, because the SAC does not provide notice of the individual role it played in the conduct alleged, apart from the role played by Alphatec Spine, there are *no* well-pled allegations against Alphatec.

Claims against a defendant may be dismissed where that defendant is lumped together with other defendants such that there are no well-pled facts to suggest any wrongdoing by that defendant.[108] This Court has found such is the case where the lumping together occurs and the complaint is "largely silent" as to the role of the

---

[106] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).
[107] *Compare* SAC *with* Pl. NuVasive Inc.'s First Am. Compl. for Damages, D.I. 105.
[108] *Howland v. Kumar*, 2019 WL 2479738, at *5 (Del. Ch. June 13, 2019).

defendant in the events at issue.[109]   But that is not the situation here.   Instead, Alphatec and Alphatec Spine are lumped together because NuVasive pleads that *both* entities participated in all the pertinent conduct alleged.

Alphatec may be correct that it is a holding company with "no actual operations," and that consequently NuVasive cannot ultimately show that Alphatec engaged in any of the conduct described in the SAC.[110]   But the pleading stage is not where NuVasive must show the sufficiency of its claims in that regard.   To survive Alphatec's Motion, NuVasive need only show that it is reasonably conceivable that Alphatec engaged in the tortious conduct alleged.[111]   As to those claims in the SAC that meet this reasonable conceivability standard, Alphatec may further test the sufficiency of NuVasive's pleadings via motion once a record has been created, should it find it appropriate to do so.   But the SAC's allegations against Alphatec are sufficiently pled as to put Alphatec on notice of the claims asserted against it, and the SAC does not fail to state a claim simply because it pleads all allegations against both Alphatec and Alphatec Spine.[112]

---

[109] *Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *12 (Del. Ch. July 26, 2010).

[110] Opening Br. in Support of Alphatec Holdings' Mot. to Dismiss Pl.'s Second Am. Compl., D.I. 251 ("Alphatec's Opening Br."), at 12.

[111] *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525, at *5 (Del. Ch. June 18, 2018) (stating that the pleading standards under Rule 12(b)(6) "are minimal, and the operative test is one of reasonable conceivability, which asks whether there is a possibility of recovery." (internal citations and quotation marks omitted)).

[112] *See Dolan v. Altice USA, Inc.*, 2019 WL 2711280, at *6 (Del. Ch. June 27, 2019) ("Delaware follows a simple notice pleading standard." (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 912 (Del. Ch. 1999)).

*B. Alphatec Has Not Waived Certain Arguments*

In 2018, Alphatec and Alphatec Spine moved to dismiss NuVasive's first amended complaint (the "FAC") in its entirety.[113] NuVasive filed the SAC in response. NuVasive points out that Alphatec and Alphatec Spine's opening brief in support of their Motion to Dismiss the FAC did not raise some of the grounds for dismissing certain claims that Alphatec has now raised in this Motion to Dismiss the SAC. As a result, argues NuVasive, those grounds for dismissal should be deemed waived. I find this argument without merit. This is not a situation where Alphatec answered the FAC, eschewing a motion to dismiss, but now seeks to dismiss the same claims in the SAC. Instead, Alphatec and Alphatec Spine moved to dismiss the FAC in its entirety. Presumably, the grounds for dismissal had merit; because NuVasive amended its pleading. These fact do not, to my mind, indicate any intent to waive the defenses that Alphatec now asserts to the SAC; and implying a waiver under these circumstances would be perverse to the administration of justice and the Court's interest in deciding cases efficiently. I find no waiver.

*C. California Law Applies to Counts IV, V, and VI*

Alphatec has moved to dismiss all six Counts pled against it in the SAC. Two of those Counts—Counts IX and X—are explicitly brought under the laws of Florida

---

[113] Defs. Alphatec Spine, Inc. and Alphatec Holdings, Inc.'s Opening Br. in Support of their Mot. to Dismiss, or in the Alternative, to Stay this Action, D.I. 117.

23

and North Carolina, respectively.[114]  There is no dispute that the claim in Count VIII—aiding and abetting Miles's breach of fiduciary duties owed to a Delaware entity—arises under Delaware law.  As to Counts IV, V, and VI, Alphatec contends that California law should apply.[115]  NuVasive does not argue that California law does not apply, and its briefing on Counts IV, V, and VI cites exclusively California law.[116]  Though NuVasive does not explicitly agree that California law applies to Counts IV, V, and VI, it appears to acquiesce to such a conclusion, and has waived the opportunity to argue that another state's law should apply to these claims.[117]  Given this situation, I decline to engage in a choice-of-law analysis, *sua sponte*.[118]  Therefore, given NuVasive's acquiescence and waiver (and given that, in any event,

---

[114] SAC, ¶¶ 150–65.

[115] Alphatec's Opening Br., at 18 ("Even though NuVasive bring its claims in Delaware, California law—not Delaware law—should apply.").

[116] Pl. NuVasive, Inc.'s Answering Br. in Opp'n to Def. Alphatec Holdings, Inc.'s Mot. to Dismiss Pl.'s Second Am. Compl, D.I. 259 ("NuVasive's Answ. Br."), at 10 ("Even if California law applies to these Counts, as [Alphatec] contends, [Alphatec's] argument that NuVasive has failed to plead allegations such that there is no reasonably conceivable basis for recovery is wrong.").

[117] *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief."); *Lechliter v. Delaware Dep't of Nat. Res. Div. of Parks & Recreation*, 2015 WL 7720277, at *3 (Del. Ch. Nov. 30, 2015).  NuVasive's position on whether California law should apply rises past mere indifference, as NuVasive forcefully argues that Count IV states a claim under Cal. Bus. & Prof Code § 17200 *et seq.* notwithstanding that the SAC does not cite the statute.

[118] *See e.g. Richards v. Copes-Vulcan, Inc.*, 213 A.3d 1196, 1197 (Del. 2019) (noting that "[t]he parties agree that Ohio law applies to this case," and making no conflict-of-laws inquiry).

California has the most significant relationship with these tort claims)[119] I apply California law to Counts IV, V, and VI.[120]

### D. Count IV

Count IV alleges unfair competition. NuVasive's briefing asserts that this is a claim under California Business & Professional Code § 17200 *et seq.*—known as California's Unfair Competition Law ("UCL")—not a claim for the common law tort of unfair competition.[121] Alphatec contends that under Delaware's notice

---

[119] "Delaware courts look to the Restatement (Second) of Conflict of Laws for guidance in conflict of law disputes." *Those Certain Underwriters at Lloyd's, London v. Nat'l Installment Ins. Servs., Inc.*, 2007 WL 4554453, at *16 (Del. Ch. Dec. 21, 2007), *aff'd*, 962 A.2d 916 (TABLE). Were I to undertake a choice-of-law analysis and find that a conflict exists between Delaware and California law, I would then employ the "most significant relationship test" to determine which state's law applies to the Counts IV, V, and VI. *State Farm Mut. Auto. Ins. Co. v. Patterson*, 7 A.3d 454, 457 (Del. 2010); *see* Restatement (Second) of Conflicts of Laws § 145(1) (1971). I have already determined in a previous decision in this matter that California has the strongest contacts with Miles's employment agreement. *NuVasive, Inc. v. Miles*, 2018 WL 4677607, at *5 (Del. Ch. Sept. 28, 2018); *see NuVasive, Inc. v. Miles*, 2019 WL 4010814, at *3 (Del. Ch. Aug. 26, 2019) ("As I explained in my September 28, 2018 Memorandum Opinion, California has the strongest contacts to the Agreement and absent the choice of law provision, California law would apply."). Though that decision dealt with choice-of-law for contractual (rather than tort) claims, the Restatement (Second) of Conflict of Laws provides that a conflict-of-laws analysis for *both* contract and tort disputes should look towards the same principles of § 6 in determining which state has the most significant relationship to the transaction or occurrence, as applicable. Restatement (Second) of Conflicts of Laws §§ 145(1), 188(1) (1971). Though the contacts here are not identical to those analyzed in my previous decision, California likewise has the strongest contacts the claims asserted in Counts IV, V, and VI. *See id*. § 6. The alleged injuries occurred in California, and to the extent any conduct causing the alleged injuries occurred outside of California, it is not alleged to have occurred in Delaware. Alphatec's hiring of Miles occurred in California. Furthermore, Delaware has no strong policy interest in the application of Delaware law to Counts IV, V, and VI.

[120] I note that under Delaware law a court must determine whether an actual—rather than a "false"—conflict exists before employing a choice-of-law analysis. *Laugelle v. Bell Helicopter Textron, Inc.*, 2013 WL 5460164, at *2 (Del. Super. Oct. 1, 2013). I comment on the most significant relationship in n.119 not as part of a comprehensive choice-of-law analysis, but merely to demonstrate that applying California law would not be inequitable given NuVasive's acquiescence.

[121] NuVasive's Answ. Br., at 10–13.

pleading standard, the claim as pled is insufficient to put Alphatec on notice of a UCL claim.[122] I disagree based on the facts pled. NuVasive's allegation of torts arising out of California—to which Alphatec itself asserts California law applies— including an allegation of "unfair competition" puts Alphatec on notice that it is being charged with a violation of California's UCL.

In order to state a claim under the UCL, "a plaintiff must show either an (1) 'unlawful, unfair, or fraudulent business act or practice,' or (2) 'unfair, deceptive, untrue or misleading advertising.'"[123] As written, the UCL establishes three varieties of unfair competition: unlawful, unfair, and fraudulent—a plaintiff need show only one in order to state a claim under the UCL.[124]

"Unlawful," in the context of the UCL, has a "straightforward and broad interpretation":

> The UCL covers a wide range of conduct. It embraces anything that can properly be called a business practice and that at the same time is forbidden by law. . . . Section 17200 borrows violations from other laws by making them independently actionable as unfair competitive practices.[125]

---

[122] Alphatec Holdings' Reply Br. in Support of its Rule 12(b)(6) Mot. to Dismiss Pl's Second Am. Compl., D.I. 262 ("Alphatec's Reply Br."), at 7.

[123] *Lippitt v. Raymond James Fin. Servs.*, 340 F.3d 1033, 1043 (9th Cir. 2003) (quoting Cal. Bus. & Prof Code § 17200).

[124] *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999).

[125] *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007) (quoting *Cel-Tech*, 973 P.2d at 560).

26

"A claim under the UCL unlawful prong may be premised upon the unlawful actions that constitute tortious interference with contractual relations."[126]  Because I conclude, *infra*, Section II.E., that NuVasive has stated such a claim in Count V, NuVasive has stated a claim for an unlawful act under the UCL.[127]

However, as Alphatec points out, the SAC seeks no remedy permitted by the UCL.  "While the scope of conduct covered by the UCL is broad, its remedies are limited . . . .  A UCL action is equitable in nature; damages cannot be recovered."[128]  A prevailing plaintiff is "generally limited to injunctive relief and restitution," and "*may not receive damages*."[129]  Alphatec argues that NuVasive's UCL claim must be dismissed because the SAC "seeks only compensatory damages (in the form of lost profits) from Alphatec."[130]  NuVasive seeks no injunctive relief from Alphatec.[131]

Although the SAC, in addition to requesting NuVasive's damages for unlawful competition, also seeks "disgorge[ment of] all compensation paid to *Miles*, including but not limited to his salary and the fair value market of his equity awards,"

---

[126] *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1017 (C.D. Cal. 2013) (citing *CRST*, 479 F.3d at 1107).

[127] *See e.g. AmeriPOD, LLC v. DavisREED Constr. Inc.*, 2017 WL 2959351, at *7 (S.D. Cal. July 11, 2017); *Salon Supply Store, LLC v. Creative Nail Design, Inc.*, 2015 WL 11438492, at *9 (S.D. Cal. June 19, 2015).

[128] *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003).

[129] *Cel-Tech*, 973 P.2d at 560 (emphasis added).

[130] Alphatec's Reply Br., at 13.

[131] *See generally* SAC.

27

this remedy does not seek relief available under the UCL from *Alphatec*.[132] NuVasive does not seek disgorgement from Alphatec, and even if it did, disgorgement is incongruous with and broader than the restitution remedy permissible under the UCL.[133] Since NuVasive seeks no remedy cognizable under the UCL, Count IV is dismissed.

*E. Count V*

Count V alleges tortious interference with contractual relations. The elements of this tort under California law are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."[134] NuVasive alleges that Alphatec tortuously interfered with NuVasive's contractual

---

[132] SAC, ¶¶ 123–24 (emphasis added).

[133] In *Kraus v. Trinity Management. Services Inc.*, 999 P.2d 718 (Cal. 2000), the California Supreme Court "defined an order for restitution as one compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Korea Supply*, 63 P.3d at 944 (quoting *Kraus*, 999 P.2d at 725) (internal quotation marks omitted). Disgorgement, which NuVasive seeks, is a "broader remedy than restitution" which "may include a restitutionary element, but is not so limited." *Id.* (citing *Kraus*, 999 P.2d at 725). *Kraus* continued:

> [An order that a defendant disgorge money obtained through an unfair business practice] may compel a defendant to surrender all money obtained through an unfair business practice even though not all is to be restored to the persons from whom it was obtained or those claiming under those persons. It has also been used to refer to surrender of all profits earned as a result of an unfair business practice regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice. *Kraus*, 999 P.2d at 725.

[134] *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 589–90 (Cal. 1990).

relationships with its medical partners and independent distributors "by soliciting NuVasive's medical partners and distributors to terminate their relationships with NuVasive and accept engagements with Alphatec."[135]

Alphatec raises but a single argument why Count V should be dismissed. It argues that the third element of the tort *cannot* conceivably be satisfied because the alleged inducement—higher commissions and indemnification from claims by NuVasive—is contained within the terms of the distributors' agreements with Alphatec Spine, to which Alphatec is *not a party*.[136] Per Alphatec, because it is not a party to these agreements, it could not have induced a breach of the distributors' existing agreements with NuVasive.

But this is a non-sequitur. Alphatec need not itself be a party to the new contractual relationships in order for the SAC to state a claim for tortious interference with contractual relations by Alphatec. NuVasive need only show that "interference [was] certain or substantially certain to occur as a result of [Alphatec's] action."[137] It is reasonably conceivable that Alphatec caused its wholly-owned subsidiary to enter into the contracts with NuVasive's medical partners and independent distributors, and that interference with NuVasive's contractual

---

[135] SAC, ¶¶ 126–28.
[136] *See e.g.* SAC, Ex. H.
[137] *Jenni Rivera Enters., LLC v. Latin World Entm't Holdings, Inc.*, 249 Cal. Rptr. 3d 122, 141 (Cal. Ct. App. 2019) (quoting *Korea Supply*, 63 P.3d at 951).

relationships with these individuals and entities was consequently substantially certain to occur. If a developed record demonstrates otherwise, summary judgment will be available, but at this pleading stage, Alphatec's Motion to Dismiss Count V is denied.

*F. Count VI*

Count VI alleges tortious interference with prospective economic advantage. The elements of the tort are: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."[138]

Tortious interference with prospective economic advantage is "distinct" from tortious interference with contractual relations, and the California Supreme Court has stated that "courts should . . . firmly distinguish the two kinds of business contexts, bringing a greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant."[139] However, some plaintiffs

---

[138] *Korea Supply*, 63 P.3d at 950 (quoting *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 49 Cal. Rptr. 2d 793, 802 (Cal. Ct. App. 1996)).
[139] *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P.2d 740, 751 (Cal. 1995).

may be able to state causes of action for both torts and "the existence of a contract does not mean that a plaintiff's claim must be brought exclusively as one for interference with contract."[140]

The distinction between the two torts is that the tort of interference with prospective economic advantage has an independent wrongfulness requirement.[141] That is, "[t]o establish a claim for interference with prospective economic advantage . . . a plaintiff must plead that the defendant engaged in an independently wrongful act."[142] This must be so, else wholesome competitive practices would be made tortious. The interference must be wrongful "by some measure beyond the fact of the interference itself."[143] Further, as the California Supreme Court has explained: "The tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial objectives, unless their interference amounts to independently actionable conduct."[144] "[A]n act is independently

---

[140] *Korea Supply*, 63 P.3d at 952–53.
[141] *Id*. at 953 (Cal. 2003). The California Supreme Court has explained that this difference emanates from the fact that while interfering with an existing contract is "'wrongful in and of itself, intentionally interfering with a plaintiff's prospective economic advantage is not.'" *Id*. (internal citations omitted).
[142] *Id*.
[143] *Della Penna*, 902 P.2d at 751.
[144] *Korea Supply*, 63 P.3d at 953.

wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."[145]

NuVasive contends that Alphatec's alleged aiding and abetting of Miles's breaches of fiduciary duty constitutes independent wrongfulness sufficient to state a claim for tortious interference with prospective economic advantage. But, as discussed, *infra*, Section II.G., NuVasive's aiding and abetting claim does not withstand Alphatec's Motion to Dismiss. Consequently, because the *only* independent wrongfulness alleged by NuVasive is the aiding and abetting claim, NuVasive has failed to plead independent wrongfulness and its claim for tortious interference with prospective economic advantage is dismissed.

### G. Count VIII[146]

Count VIII alleges that Alphatec aided and abetted Miles's alleged breaches of fiduciary duty. This claim has four elements "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by the non-fiduciary defendants, and (iv) damages proximately caused by the

---

[145] *Id*. at 954.

[146] As noted, *supra*, the parties do not dispute that Delaware law applies to the aiding and abetting claim. Were I required to opine on the question, I would find that Delaware applies. *Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *19 (Del. Ch. July 26, 2010) ("When the claim against a third-party is that it was knowingly complicitous in a breach of fiduciary duty against a Delaware entity, Delaware's interest is paramount."); *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1211–12 (Del. Ch. 2010).

32

breach."[147]   While Alphatec does not concede that Miles in fact breached his fiduciary duties to NuVasive, there is no doubt that the SAC alleges behavior on Miles's part clearly incompatible with the duty of a fiduciary to his entity.  I note that Miles has not moved to dismiss the fiduciary duty claims asserted against him, and has instead answered the SAC.[148]  Alphatec, however, argues that NuVasive has failed to plead facts from which I may reasonably infer that Alphatec knowingly participated in Miles's alleged breach of duty.  I agree.

One is generally not responsible for the torts of another.  The element of knowing participation requires that "the third party act with the knowledge that the conduct advocated or assisted constitutes" a breach of duty.[149]  This requires that the plaintiff plead that the alleged aider and abettor's participation in the breach was substantial, and that the third party acted with scienter, *i.e.* knowingly, intentionally or with reckless indifference.[150]  In order to establish scienter, the plaintiff must demonstrate that the alleged aider and abettor had "actual or constructive knowledge that their conduct was legally improper."[151]  While a claim of knowing participation need not be pled with particularity, the plaintiff must plead factual allegations "from

---

[147] *In re Rural Metro Corp.*, 88 A.3d 54, 80 (Del. Ch. 2014), *aff'd sub nom. RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).

[148] Def. Patrick Miles' Answ. to Pl. NuVasive, Inc.'s Second Am. Compl., D.I. 244.

[149] *Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *13 (Del. Ch. Aug. 29, 2018) (quoting *Malpiede*, 780 A.2d at 1097).

[150] *RBC*, 129 A.3d at 862.

[151] *Id*. (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)).

which knowing participation can be reasonably inferred."[152] "The scienter pleading requirement is among the most difficult in our law to satisfy."[153] That must be the case because, again, generally one is not responsible for the torts of others. For a third party to be found liable as an aider and abettor requires an independent tort on the aider and abettor's part, which in turn requires the pleading of guilty participation; that is, scienter.

NuVasive has alleged a scheme whereby Alphatec communicated with Miles for over a year while Miles owed fiduciary duties to NuVasive. NuVasive also alleges that Miles purchased $500,000 in Alphatec stock in a private placement while he was employed by NuVasive.

As an initial matter, the claims involving Miles's alleged investment in Alphatec do not state a claim for aiding and abetting breach of fiduciary duty. Though NuVasive alleges such an investment was a breach of NuVasive's Code of Conduct, and that Miles did not disclose such investment to NuVasive, there is no allegation that Alphatec knew of such policy, and pleading a breach of an internal policy is not equivalent to pleading a breach of a common law fiduciary duty. Nor is the fact that Miles made the investment through a third party entity (called "MOM") sufficient to plead knowing participation on the part of Alphatec. The

---

[152] *Skye Mineral Inv'rs, LLC v. DXS Capital (U.S.) Ltd.*, 2020 WL 881544, at *29 (Del. Ch. Feb. 24, 2020).
[153] *Mesirov*, 2018 WL 4182204, at *13 (citing *RBC*, 129 A.3d at 866).

34

SAC avers that Miles used this entity to conceal his investment from NuVasive, and its theory, as I understand it, is that Alphatec was "in" on this plot by Miles. But giving NuVasive the benefit of the doubt that Alphatec knew Miles controlled "MOM," at most NuVasive pleads that Alphatec facilitated Miles's investment by permitting him to make the investment. NuVasive fails to plead that Alphatec knew of, or played any role in, Miles's alleged concealment of the investment.[154] NuVasive cites no case, nor could it, that stands for an outright prohibition on a company counting as its investors a fiduciary of a competitor, nor a requirement that such company alert its competitor in such an instance.[155] Moreover, that Miles used an entity to make an investment is unremarkable, and it is not reasonably conceivable that this allegation alone gives rise to a reasonable inference of Alphatec's scienter.

NuVasive also alleges that Miles and Alphatec engaged in a scheme to "steal NuVasive's employees, distributors, customers, medical partners, technology and

---

[154] NuVasive pleads that Alphatec aided Miles's concealment by "not disclosing that Miles was the beneficial owner of the shares," but fails to identify a duty requiring Alphatec to do so. *See In re Oracle Corp. Derivative Litig.*, 2020 WL 3410745, at *12 (Del. Ch. June 22, 2020).

[155] NuVasive also attempts to paint Alphatec's press release of the private placement sale as an acknowledgement that the private placement's purpose was to enable Alphatec to compete with NuVasive. The pertinent part of the statement reads: "We believe the additional capital will allow us to execute on our plans to expand our surgeon customer base, drive growth through the launch of our new products . . . as well as support the transformation of our distribution channel." SAC, ¶ 37. Insofar as one can ascertain the purpose of the private placement sale from the press release, it appears to simply state that the funds will be used to grow and support Alphatec's business. To the extent Alphatec and NuVasive are competitors one can infer that necessarily Alphatec's growth could negatively impact NuVasive. But the same could be said for *every other company* in the industry. Consequently, the connection between a broad statement of the intended use of the funds and any harm to NuVasive is too attenuated to give rise to a reasonably conceivable inference of Alphatec's scienter that Miles was acting to aid Alphatec's at NuVasive's expense.

business strategies."[156] But NuVasive's allegations of such a scheme do not state a claim upon which relief may be granted. In understanding this analysis it is helpful to acknowledge that Alphatec is not alleged to have aided and abetted a breach of Miles's employment agreement, because I have found that the contractual restrictions on Miles's competition and solicitation were unenforceable under California law.[157]

NuVasive avers that "[i]mmediately after submitting his resignation, Miles and Alphatec began raiding NuVasive's executives, sales force, and other employees, to obtain their relationships, know-how, and proprietary information."[158] But while this activity might support, for instance, a claim of aiding and abetting breach of a non-compete (if a viable non-compete existed here), such allegation cannot support a claim for aiding and abetting *breach of fiduciary duty* because that duty ended when Miles left NuVasive, and a breach of duty claim predicated on acts *after* Miles's resignation must necessarily fail.[159] For the same reason, NuVasive's allegations that Miles and Alphatec have "already begin [sic]"—as of the time of the filing of the SAC—to use NuVasive's confidential information does not state a

---

[156] SAC, ¶ 1.
[157] *NuVasive, Inc. v. Miles*, 2019 WL 4010814 (Del. Ch. Aug. 26, 2019).
[158] SAC, ¶ 7.
[159] *See Gen. Video Corp. v. Kertesz*, 2008 WL 5247120, at *18 (Del. Ch. Dec. 17, 2008) (holding that any claims for breach of fiduciary duty "predicated on acts" occurring after the resignation of the defendant as a director and/or officer of certain entities "must fail").

36

claim, because nowhere does NuVasive allege that Alphatec used such information *while* Miles owed fiduciary duties to NuVasive.[160]

NuVasive also makes miscellaneous allegations regarding Miles's non-disclosure of his relationship with Alphatec.[161] But, like the deficiencies with the investment-related allegations, NuVasive has failed to plead any involvement by Alphatec in Miles's non-disclosure of the parties' relationship, nor an independent duty of Alphatec to disclose such information.[162]

Next, NuVasive argues that Miles breached a fiduciary duty aided by Alphatec when Miles held clandestine conversations with Alphatec—while Miles was a NuVasive fiduciary—where NuVasive's confidential information was disclosed. Such an allegation, if properly pled, could withstand a motion to dismiss.[163] But a review of the SAC reveals that *is simply not what is pled*, and the necessary pleading of scienter is absent. The content of only one alleged conversation between Miles and Alphatec, via email, is recounted in the SAC. NuVasive avers that "[i]n December 2016, Miles e-mailed Stephen Hochschuler, a key surgeon within the

---

[160] SAC, ¶ 119.

[161] *Id*. ¶¶ 118 ("Miles' scheme to gain access to NuVasive's most confidential and proprietary business information by actively misleading NuVasive as to his relationship and personal investment with Alphatec constitutes unfair competition."), 147 ("While employed by NuVasive, Miles breached [his fiduciary duties to NuVasive] by: . . . (d) actively misleading NuVasive as to his loyalty to the Company, assuring the Board that he "bleeds purple"; and (e) failing to disclose his continued contacts with Alphatec.").

[162] *See In re Oracle Corp. Derivative Litig.*, 2020 WL 3410745, at *12 (Del. Ch. June 22, 2020).

[163] *E.g. Beard Research, Inc. v. Kates*, 8 A.3d 573, 603–05 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010)).

spinal surgery field, and a substantial Alphatec shareowner, praising the appointment of former NuVasive employee Terry Rich as Alphatec's CEO."[164]  Miles assured Hochshuler that "you will like him as he is a harda[**]."[165]  Regardless of the propriety of this email, it is not actionable; it is not reasonably conceivable that Miles's personal opinion of the durability of Mr. Rich's fundament was NuVasive's confidential information, or that disclosing that opinion breached a fiduciary duty. Otherwise, the SAC is silent as to any information Miles may have shared with Alphatec, while still owing fiduciary duties to NuVasive.

Additionally, NuVasive pleads that while Miles worked for NuVasive, he was "engaged in surreptitious discussions to become Alphatec's 'leader.'"[166]  But the allegation that Miles negotiated for employment with Alphatec while at NuVasive—which is a safe bet considering Miles announced his intent to join Alphatec contemporaneously with his resignation from NuVasive—does *not* constitute an allegation of Alphatec's support for, or even contemporaneous knowledge of, Miles's conversion of NuVasive's confidential information.  NuVasive pleads that Miles concealed his discussions with Alphatec from NuVasive and "made no effort to recuse himself from ongoing discussions and disclosures of NuVasive's most

---

[164] SAC, ¶ 35.
[165] *Id*.  I note that the spelling of the surgeon's last name is inconsistent in the SAC.
[166] *Id*. ¶ 40.

confidential business strategies and other information."[167]  This is a part of the pleading alleging the Miles *himself* breached a fiduciary duty.  But in order to support an aiding and abetting claim, the pled facts would need to support an inference that Alphatec not only intended to lure Miles away from NuVasive, but also that it materially supported or encouraged the purloining of NuVasive confidential information while Miles owed fiduciary duties.[168]  No such pleading is made in the SAC.  Miles's alleged failure to make disclosure and to not recuse himself from confidential discussions, once he had decided to join Alphatec, does not give rise to a reasonable inference that *Alphatec* acted with the requisite scienter in aiding such a breach.  There is no well-pled allegation that in negotiating for Miles's employment, Alphatec had "actual or constructive knowledge that [its] conduct was legally improper."[169]

All that remains is an unsupported allegation that Miles "consult[ed] with Alphatec board members and shareowners about Alphatec-related business."[170]  While the gravamen of the aiding and abetting allegations allege transmission of NuVasive's confidential information, this allegation centers only on Alphatec's

---

[167] *Id.*

[168] *Agspring Holdco, LLC v. NGP X US Holdings, L.P.*, 2020 WL 4355555, at *21 (Del. Ch. July 30, 2020) ("[S]ubstantial assistance means that the secondary actor must have provided assistance or participation in aid of the primary actor's allegedly unlawful acts." (quoting *Oracle*, 2020 WL 3410745, at *11) (internal quotation marks omitted)).

[169] *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)).

[170] SAC, ¶ 147.

business. Moreover, such an allegation, without more "does not adequately allege in a non-conclusory fashion that [Alphatec] knowingly participated in a breach of fiduciary duty."[171] It does not plead scienter on Alphatec's part.

Therefore, NuVasive has failed to state a claim for aiding and abetting breach of fiduciary duty and Count VIII must be dismissed.

*H. Count IX*

Count IX alleges deceptive and unfair trade practices under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").[172] A FDUTPA claim has three elements: (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages.[173] A deceptive act is one that is "likely to mislead consumers"—NuVasive does not allege that Alphatec engaged in any such conduct.[174] On the other hand, an unfair practice is one that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, (or competitors or other businessmen)."[175] The parties dispute whether Alphatec's

---

[171] *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *23 (Del. Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006).

[172] Fla. Stat. § 501.201 *et seq.*

[173] *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007) (citing *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)).

[174] *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000) (internal quotation marks omitted).

[175] *Nature's Prod., Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1322 (S.D. Fla. 2013) (quoting *Hanson Hams, Inc. v. HBH Franchise Co., LLC*, 2003 WL 22768687, at *2 (S.D. Fla. Nov. 7, 2003)) (internal quotation marks omitted).

alleged actions constitute an unfair practice. Whether conduct constitutes an unfair trade practice is a question of fact.[176]

NuVasive's allegations under the FDUTPA concern Absolute Medical (a Florida-based business). NuVasive alleges that Alphatec knew that Absolute Medical had a five-year contract to serve as NuVasive's distributor in certain counties and hospitals in the State of Florida, and that such contract prohibited Absolute Medical from distributing products from any of NuVasive's competitors.[177] NuVasive alleges that Alphatec encouraged Absolute Medical's principal, Mr. Soufleris, to form AMS with the understanding that AMS would sign an exclusive contract with Alphatec.[178] The inference intended is that creation of AMS would allow Absolute Medical to conceal its breach, or avoid the consequences thereof. NuVasive alleges that Absolute Medical breached its contracts with NuVasive and that Alphatec induced and encouraged such breach.[179] The SAC also alleges that Alphatec induced Absolute Medical's employees and sales representatives to breach their restrictive covenants.[180] NuVasive alleges that Alphatec is indemnifying Absolute Medical, Soufleris, Hawley, and Miller for actions brought by NuVasive.[181]

---

[176] *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009).
[177] SAC, ¶¶ 60, 77.
[178] *Id.* ¶¶ 69–70.
[179] *Id.* ¶ 154.
[180] *Id.*
[181] *Id.* ¶ 78.

Alphatec contends that the actions alleged do not constitute an unfair practice, citing, in effect, the definition of an unfair practice.[182] But given the Plaintiff-friendly inferences I must draw at this pleading stage, and given that whether a course of action is an unfair trade practice is a question of fact, it is, at a minimum, reasonably conceivable that Alphatec acted in a manner that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, (or competitors or other businessmen)."[183]

The "FDUTPA offers two types of remedies: equitable relief in the form of declaratory or injunctive relief pursuant to Fla. Stat. 501.211(1) or 'actual damages' pursuant to Fla. Stat. 501.211(2)."[184] "The measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties."[185] Actual damages do not include

---

[182] Alphatec does argue in its reply brief that "[o]ffers of indemnity . . . are not considered unlawful inference in the context of business competition," citing a California case. Alphatec's Reply Br., at 22 (citing *PMC, Inc. v. Saban Entm't, Inc.*, 52 Cal. Rptr. 2d 877 (Cal. Ct. App. 1996)). The extent to which a California case would be applicable to resolving a claim under Florida law is unclear, but regardless, "[n]ormally, this court does not entertain arguments raised for the first time in a reply brief," and I do not consider that argument here. *Pryor v. IAC/InterActiveCorp*, 2012 WL 2046827, at *6 n.71 (Del. Ch. June 7, 2012).

[183] *Nature's Prod., Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1322 (S.D. Fla. 2013) (quoting *Hanson Hams, Inc. v. HBH Franchise Co., LLC*, 2003 WL 22768687, at *2 (S.D. Fla. Nov. 7, 2003)) (internal quotation marks omitted).

[184] *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1356 (S.D. Fla. 1999), *aff'd sub nom. Eclipse Med., Inc. v. Am. Hydro-Surgical*, 235 F.3d 1344 (11th Cir. 2000).

[185] *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006) (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)).

consequential damages for purposes of the FDUTPA.[186]  Alphatec argues that NuVasive seeks *only* lost profits, which are the "quintessential example of consequential damages."[187]

NuVasive denies that it merely seeks lost profits, and also disagrees that lost profits are categorically unrecoverable actual damages.  The SAC states that "Alphatec's violations of the FDUTPA have aggrieved NuVasive and caused it to suffer damages and has incurred (and will continue to incur) considerable costs and attorneys' fees."[188]  The SAC does not limit the damages sought to lost profits. Having generally pled damages recoverable under the FDUTPA, NuVasive has stated a claim under Rule 12(b)(6).  But the damages that NuVasive may ultimately obtain remain, of course, limited by the bounds set by Florida law.

*I. Count X*

Count X alleges unfair and deceptive trade practices under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA").[189]  To prevail on a NCUDTPA claim, the plaintiff must show: (1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce,

---

[186] *Id.*

[187] *Hardwick Props., Inc. v. Newbern*, 711 So. 2d 35, 40 (Fla. Dist. Ct. App. 1998) (citing *Nyquist v. Randall*, 819 F.2d 1014, 1017 (11th Cir. 1987)).

[188] SAC, ¶ 156.

[189] N.C. Gen. Stat. § 75–1 *et seq.*

and (3) the act proximately caused injury to the plaintiff.[190]  A practice is unfair "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers . . . . [or] amounts to an inequitable assertion of . . . power or position."[191]  "To prove deception, while 'it is not necessary . . . to show fraud, bad faith, deliberate or knowing acts of deception, or actual deception, [a] plaintiff must, nevertheless, show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception.'"[192]

NuVasive's NCUDTPA claim alleges that Alphatec solicited and induced former inoSpine contractor/employees Jones and Kormanis to breach their obligations to inoSpine by selling Alphatec products and that Alphatec agreed to indemnify Jones and Kormanis for any lawsuits brought by NuVasive.[193]

Actions for unfair or deceptive trade practices are distinct from actions for breach of contract, and "mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain such an action under [the NCUDTPA]."[194]

---

[190] *Capital Res., LLC v. Chelda, Inc.*, 735 S.E.2d 203, 212 (N.C. Ct. App. 2012) (citing *Kewaunee Scientific Corp. v. Pegram*, 503 S.E.2d 417, 420 (N.C. Ct. App. 1998)).

[191] *Id.* (quoting *McInerney v. Pinehurst Area Realty, Inc.*, 590 S.E.2d 313, 316–17 (N.C. Ct. App. 2004)).

[192] *Id.* (quoting *Overstreet v. Brookland, Inc.*, 279 S.E.2d 1, 7 (N.C. Ct. App. 1981)).

[193] SAC, ¶ 161.  NuVasive alleges that it is a third party beneficiary of Jones and Kormanis's agreements with inoSpine, an allegation that is supported by those agreements, which are exhibits to the SAC.  SAC, Ex. J, § 10; SAC, Ex. K, § 10.

[194] *Branch Banking & Tr. Co. v. Thompson*, 418 S.E.2d 694, 700 (N.C. Ct. App. 1992).

44

Where the alleged unlawful act is breach of contract, "[t]o recover for unfair and deceptive trade practices, a party must show substantial aggravating circumstances attending the breach of contract."[195]

NuVasive asserts in briefing that "[Alphatec] used Miles'[s] confidential information to target and induce Messrs. Jones and Kormanis to breach their contracts with NuVasive and begin selling [Alphatec's] products" while "agree[ing] to indemnify them for any actions NuVasive brought against them for such breaches."[196] The SAC does not actually plead that Alphatec used confidential information to recruit Jones and Kormanis, what the confidential information was (other than Jones and Kormanis's identities) or how Alphatec allegedly used such information.[197]

But in addition to use of confidential information for solicitation of Messrs. Jones and Kormanis, NuVasive also alleges that Alphatec interfered with their non-competition agreements (of which NuVasive was a third party beneficiary).

NuVasive cites *Sandhills Home Care, L.L.C. v. Companion Home Care—Unimed, Inc.*,[198] in contending that courts have found similar acts violate the NCUDTPA. *Sandhills* held that the contention that the NCUDTPA did "not extend

---

[195] *Bob Timberlake Collection, Inc. v. Edwards*, 626 S.E.2d 315, 323 (N.C. Ct. App. 2006) (citing *Branch Banking*, 418 S.E.2d at 700).
[196] NuVasive's Answ. Br., at 20–21 (citing SAC, ¶¶ 79–97).
[197] *See* SAC, ¶¶ 79–97, 158–165.
[198] 2016 WL 4164460 (N.C. Super. Ct. Aug. 1, 2016).

to claims arising out of an employer interfering with its competitors non-competition agreements has been squarely rejected by [North Carolina's] appellate courts."[199] The court denied a motion to dismiss a NCUDTPA claim because the plaintiff had "adequately alleged that [the plaintiff's competitor] tortiously interfered with Plaintiff's customer relationships and with its former employees' restrictive covenants."[200] Notably, *Sandhill*'s holding was based on a well-pled tortious interference claim, not a breach of contract claim, and consequently there is *no mention* of the required showing of substantial aggravating circumstances that must attend to a breach of contract in order to state a claim under the NCUDTPA.[201]

In *United Laboratories, Inc. v. Kuykendall*,[202] the North Carolina Supreme Court "specifically held that tortious interference with a restrictive covenant by a competitor stated a claim for unfair and deceptive trade practices under [the NCUDTPA]."[203] In Section II.E., *supra*, I denied Alphatec's Motion to Dismiss the tortious interference claim (Count V) under California law. It remains to be seen upon the development of a record whether Alphatec's actions vis-á-vis Jones and Kormanis are sufficient to amount to tortious interference.[204] But at this pleading

---

[199] *Id.* at *16.
[200] *Id.*
[201] *Id.*
[202] 370 S.E.2d 375 (N.C. 1988).
[203] *Roane-Barker v. Se. Hosp. Supply Corp.*, 392 S.E.2d 663, 670 (N.C. Ct. App. 1990) (citing *United Laboratories*, 370 S.E.2d at 389).
[204] *Id.* at 663 ("Because defendant's acts did amount to tortious interference with contract, as in *Kuykendall*, the court did not err in finding an unfair or deceptive trade practice . . . .").

stage, the SAC states a claim for a violation of the NCUDTPA, and, consequently, Alphatec's Motion to Dismiss Count X is denied.

### III. CONCLUSION

Alphatec's Motion to Dismiss is GRANTED IN PART and DENIED IN PART. The parties should submit a form of order consistent with this Memorandum Opinion.